## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

| | | |
|---|---|---|
| **SKYLER CHANDLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.: 1:21-cv-341** |
| | ) | |
| **LOUISIANA-PACIFIC** | ) | **JURY TRIAL DEMANDED** |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

COMES NOW Plaintiff Skyler Chandler ("Plaintiff" or "Chandler"), by and through the undersigned counsel, and hereby alleges as his Complaint against Defendant Louisiana-Pacific Corporation ("Louisiana-Pacific" or "LP") as follows:

### JURISDICTION AND VENUE

1. This is a Complaint for legal and equitable relief to redress Defendant's violations of Plaintiff's rights secured by:

   a. The Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended;

   b. Title VII of the Civil Rights Act of 1964, ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.* & 42 U.S.C. § 1981a; and

   c. The Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101, *et seq.* & 42 U.S.C. § 1981a.

2. Federal subject matter jurisdiction exists pursuant to:

     a.     28 U.S.C. §§ 1331, 1343(a)(3); and

     b.     Title VII, 42 U.S.C. § 2000e-5(f)(3).

3.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e–5(f)(3).

## PARTIES

4.     Plaintiff Skyler Chandler is a Caucasian, adult male whom Defendant employed in Clarke County, Alabama. Mr. Chandler is a resident of Grove Hill (Clarke County), Alabama.

5.     Plaintiff has a "disability" for ADA purposes.

6.     Defendant Louisiana-Pacific Corporation is a publicly traded corporation headquartered in Nashville, Tennessee. LP is a building-products manufacturer with thousands of employees across myriad locations including several hundred employees at its manufacturing facility in Clarke County, Alabama where LP employed Plaintiff.

## NATURE OF THE ACTION

7.     Plaintiff brings this action to redress unlawful practices and acts of intentional discrimination which Louisiana-Pacific, as Plaintiff's employer or former employer, committed.

8.     This lawsuit seeks to redress grievances resulting from actions of Defendant, its agents, servants, and employees with respect to Plaintiff's employment and otherwise.

## ADMINISTRATIVE PROCEDURES

9.    On October 26, 2020, within 180 days of learning of the acts of discrimination of which he complains, Plaintiff Skyler Chandler filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 425-2021-00096, alleging violations of Title VII and the ADA.  (*See* Exhibit A).

10.    On May 3, 2021, at the undersigned's request, the EEOC mailed a Dismissal and Notice of Rights for Charge No. 425-2021-00096, which was received on approximately May 6, 2021. (*See* Exhibit B).

11.    Because Plaintiff filed this lawsuit within 90 days of receipt of the EEOC's Notice of Rights letter, this action was timely filed.

### STATEMENT OF FACTS

12.    Plaintiff began working for LP on August 12, 2019 in the Flame Block section of LP's Clarke County facility in Thomasville, Alabama.

13.    Initially, Plaintiff served in a general Utility Position. But LP quickly promoted him to Water Treatment.

14.    Plaintiff later learned that qualified African-American employees senior to him wanted this job, and that it was (at least in part) Plaintiff's race that won him the position.

15.    LP employed alleged white supremacist Austin Green (Caucasian) as one of several Flame Block supervisors during Plaintiff's employment. In that capacity, Green had direct supervisory authority over Plaintiff, and he exercised control and

influence over the employment decisions about which Plaintiff complains herein.

16.     Austin Green exercised control over Flame Block matters as if he had official supervisory authority for the entire department, and many employees, including Plaintiff, believed he did.

17.     During all times relevant to this action, Sundy Phares (Caucasian) served as LP's Human Resources ("HR") Manager.  In that capacity, Phares exercised control and influence over the employment decisions about which Plaintiff complains herein.

18.     Upon information and belief, Green and Phares reported to Drew Scott (Caucasian), who served as the Thomasville Assistant Plant Manager and a decision-maker for the employment actions Plaintiff challenges in this Complaint.

19.     Scott reported to Jim Motes (Caucasian), who served as the Thomasville Plant Manager ultimately charged with overseeing all operations and employment decisions, including those challenged herein.

20.     Motes is allegedly racist, and he and Scott allowed white supremacists to work at their Mill at both the hourly employee and manager level.

21.     Indeed, under the tenure of Motes, Phares, and Green, among others, Caucasian employees received better treatment than African-Americans employees, almost as a matter of policy.

22.     These managers[1] promoted a workplace culture of race discrimination by,

---

[1] Every LP manager identified in this Complaint, among others, has been named in race discrimination and/or retaliation actions; two multi-plaintiff lawsuits are pending in this division, and another is with the EEOC. Upon information and belief, LP fired Scott, Motes, and Phares,

among other things, allowing Caucasian managers to exclude the one African-American Flame Block supervisor from attending management meetings, participating in decision-making, and providing input concerning personnel matters.

23.    African-American employees accused of sleeping on the job would be terminated, but a Caucasian employee would not even receive a write-up for the same alleged misconduct. *See Hudson et al. v. Louisiana-Pacific Corporation*, 1:20-cv-00582 (Ala. M.D. Dec. 1, 2020).

24.    Caucasian supervisors were allowed to adjust employees' work schedules in LP's computer system to accurately reflect the hours employees actually worked. But when an African-American supervisor did the same thing, LP accused him of impropriety and terminated his employment.  *See Williams et al. v. Louisiana-Pacific Corporation*, 1:21-cv-00063 (Ala. S.D. February 8, 2021).

25.    Plaintiff has a stout build and keeps a shaved head.  In rural Alabama, Plaintiff is routinely misperceived as a "racist skinhead" (*i.e.*, a safe person to share racist ideologies with) based on his appearance alone.

26.    In approximately August 2019, early in his employment, Plaintiff walked into Flame Block Supervisor Austin Green's office to ask about acquiring personal protective equipment ("PPE").

27.    Green was in the middle of a conversation with Stevie Overton, an openly

_____

among others, after former LP employees John Hudson, Elbert Wright, and Anthony Dandridge (all African-American) filed EEOC Charges. Upon information and belief, Austin Green left the company in January 2020.

racist Caucasian maintenance employee who also worked in Flame Block.

28.    Green said, in Plaintiff's presence, that "African-Americans" are (1) "demons"' (2) "only good as servants"' and (3) "good for laughing at." Overton agreed.

29.    Plaintiff asked Green to stop speaking with racist language in his presence. Green and Overton were both visibility displeased with Plaintiff's request.

30.    About a week later, in approximately September 2019,[2] Plaintiff reported unlawful race discrimination to Phares based on the conversation he witnessed.

31.    Plaintiff also reported that he witnessed Green target his African-American co-worker, Charles Richardson. Plaintiff observed Green "literally set up" Mr. Richardson "only to replace him with a Caucasian kid barely out of high school."

32.    Phares appeared disinterested, and she tried to hurry Plaintiff out of the office.

33.    Phares did not ask any questions or conduct any investigation as a result of Chandler's report of race discrimination; indeed, she is similar to Green in that Phares allegedly harbors racial animus towards African-American employees.

34.    To that end, Phares did not trust African-American employees, and she was vocal about this distrust.

---

[2] Plaintiff acknowledges that some averments in this Complaint — the timeline and sequence of certain events, in particular — differ from earlier versions made available to the Defendant. Witnesses' recollections were refreshed after reviewing documents obtained by the EEOC and Louisiana-Pacific.

35.    Phares also referred to African-American employees as "you people" with a condescending tone, and she did this many times.

36.    In March 2020, while speaking with former LP Supervisor Kelvin Lewis (an African-American U.S. Army combat veteran), Phares, who was known for yelling, blurted out: "I don't trust *you people*."

37.    Phares' discriminatory intent was so obvious that LP Supervisor Joe Gage interrupted immediately, asked to speak with Phares alone, and all but directly apologized to Mr. Lewis.

38.    In addition, Phares went out of her way to ensure African-American employees did not receive the extra pay they earned when serving in a temporary, higher paying position. When Caucasian employees were eligible for extra pay under these exact circumstances, Phares did not interfere and those Caucasian employees were appropriately compensated.

39.    In short, Plaintiff avers that Phares — along with Green, Motes, and Scott — had every reason to dislike a Caucasian employee who openly challenged discrimination against African-Americans in the workplace.

40.    Almost immediately after Plaintiff reported race discrimination to Phares in September 2019, his work environment became intolerable

41.    To that end, LP demoted Plaintiff from Water Treatment back to a Utility position.

42.    Plaintiff told Phares he felt the demotion and pay cut was a direct result

of his complaint about race discrimination against his African-American co-workers.

43.   Phares denied Plaintiff's allegations without investigation.

44.   Stevie Overton and Brent Newton, both Caucasian and openly racist hourly employees, began bullying Plaintiff.

45.   To that end, Plaintiff was routinely accosted, threatened, demeaned, and targeted by these (and other) Caucasian co-workers for months.

46.   For example, Newton, whom Plaintiff trained, took Plaintiff's radio to prevent him from communicating with the Plant and, therefore, setting him up to fail.

47.   In addition, both Green and Phares (among others) refused Plaintiff the safety equipment he needed while working with toxic chemicals, which ultimately caused severe damage to Plaintiff's physical and mental health.

48.   It was obvious to Plaintiff (and Flame Block Supervisor Kelvin Lewis) that Phares and Green were working with others to force Plaintiff to quit, or to manufacture a pretextual reason for termination.

49.   In early December 2019, Plaintiff  disclosed his disability to Phares and asked for a reasonable accommodation under the Americans with Disabilities Act.  He told Phares he had rights under this Act.

50.   As Plaintiff explained to Phares, he has two, long-diagnosed and treatable mental health impairments: Bi-polar 1 and Schizoaffective Disorder.[3]

_____

[3] Plaintiff does not come forward and publicly disclose this information lightly. On this issue, Plaintiff stated as follows in his EEOC Charge: "These diagnoses are deeply private, and in a lawful work environment, disclosure would be unnecessary. I am a load operator, a forklift operator, and

51.     Concerned about stigma, Plaintiff historically does not share his mental health conditions with anyone (not even most family).

52     Plaintiff told Phares he was experiencing extreme bullying on a daily basis because he spoke up about race discrimination.  Plaintiff explained that his disabilities negatively impact his ability to cope with daily, severe conflict and confrontation.

53.     Plaintiff told Phares he would accept any accommodation that would lessen the abuse.  Plaintiff made it clear he would transfer to any position, work any schedule, and/or work in any other part of the Plant.

54.     After inquiring about the extent of Plaintiff's disabilities, Phares forced Plaintiff to disclose his disabilities to Austin Green, the alleged white supremacist whom Plaintiff reported and likely the chief orchestrator of the abuse about which Plaintiff was complaining.

55.     Plaintiff did not ask for (and did not want) medical leave at that point in December 2019, but Phares ordered him home immediately.

56.     In December 2019, within a few days of Phares dismissing Plaintiff, Austin Green gave Flame Block Manager Kelvin Lewis "a heads up" that Flame Block "was gonna be losing Skyler Chandler for being schizophrenic and bi-polar." Green said this news came directly from Phares.

---

I've served my elders working in nursing homes, among many other things in my approximately fifteen years of work experience. I worked for Georgia Pacific, a union-Plant, prior to LPC. I was perfectly capable of doing the essential functions of my job at LPC."

57.     Lewis admonished Green for disclosing an employee's confidential health information.

58.     Plaintiff's private health information soon became very public as Green, undeterred by Lewis' warning, continued to share it with Flame Block personnel.

59.     Around Christmas of 2019, LP's leak of Plaintiff's private medical condition reached Plaintiff's in-laws who owned the home Plaintiff lived in with his family at the time; they kicked him and his wife out.

60.     Plaintiff lost his home and many of his personal possessions as a direct result of LP's failure to safeguard his confidential health information.

61.     Plaintiff reported Green's misconduct (citing a HIPPA violation) to Phares in a text message dated January 2, 2020, but Phares did nothing.

62.     In addition to disclosing diagnoses, Green also lied to Plaintiff's co-workers, claiming Plaintiff threatened to commit mass murder at the Clarke County Mill.

63.     Plaintiff made no threats to anyone, and these lies caused Plaintiff to suffer severe mental anguish.

64.     Upon information and belief, Green (working with Phares) spread this false narrative to discredit the one white person brave enough to speak out against racism at the Clarke County Mill.

65.     The Standard Insurance Company ("The Standard"), LP's third-party leave and benefits administrator, approved Plaintiff for short term disability benefits

through January 5, 2020.

66.     Upon information and belief, Plaintiff returned to work on January 6, 2020,[4] around the same time Austin Green was preparing to leave the company.

67.     But the abuse continued, as did LP's refusal to provide Plaintiff with PPE and training. Plaintiff practically begged Phares to help him obtain safety equipment, but she refused.

68.     Plaintiff pressed on breathing in toxic chemicals until he collapsed onto a concrete floor in a pool of his own vomit in February 2020. A co-worker found Plaintiff passed out and alerted management.

69.     Plaintiff began vomiting and coughing up blood, and he struggled just to breathe.

70.     Phares again placed Plaintiff on leave, ensuring him that he would receive short term disability payments through The Standard.

71.     At the same time, however, Phares told Plaintiff he was not a good fit for "her mill."

72.     Phares gave Plaintiff a laundry list of tasks to complete before he could return to work.  For example, Phares insisted that Plaintiff go through an in-patient "detox" program at his own expense even though Plaintiff had nothing to detox from.

73.     No one told Plaintiff he may have been eligible for workers' compensation benefits, and he was forced to pay his own medical bills, which were

---

[4] *See* note 2, *supra*.

substantial, for an on-the-job injury.

74.    On February 26, 2020, while on leave, Plaintiff first reported mistreatment of Brian Williams (African-American) to Phares.

75.    Similar to the situation with Charles Richardson, Plaintiff witnessed Green set Williams up for termination so that LP could hire "a white kid."

76.    Plaintiff did everything Phares required for him to return to work.  The Standard confirmed Plaintiff had done his part, and it was LP that needed to respond. Phares told Plaintiff she did, in fact, respond.

77.    But when Plaintiff showed up to work, Phares sent him home.

78.    Even though Plaintiff was approved for short term disability payments, he was not receiving those payments, despite multiple pleas to Phares and hours on the phone with The Standard.

79.    When Stevie Overton had difficulties with his pay while absent for physical therapy due to a rotator cuff injury, Phares allowed Overton to simply clock-in and leave the Plant.

80.    Unlike Plaintiff, however, Overton did not have a mental impairment, and he shared LP management's racist ideology.

81.    Plaintiff began suspecting Phares was "giving him the run around." Accordingly, desperate and unable to afford vital medication or even food for his family, Plaintiff contacted Phares again.

82.    To that end, the two exchanged the following text messages between

April 24, 2020 and April 27, 2020:

> <u>Plaintiff</u>: According to the standard they have the forms and have had them and I'm approved. I've spoken to them already days ago.

> <u>Phares</u>: Then I'm not sure why you were not paid - I will call The Standard and see what is holding up pay.

> Again, The Standard guides the pay advice.

> <u>Plaintiff</u>: I came to work was sent home. Told to work on my health I'd be taken care of everything was going to be alright. I'd get 60 percent of the normal income. Instead I received nothing. Spent the last I had right after on doctor visits  All of my bills fell behind my new truck in repossession. And I can't afford basic medication for over a month now which I'd already stated. Zero income since February 28 no money for food and basics. I have done countless attempts to get the resolved. But I need my pay or unemployment. Because this this isn't help and in 15 years of experience I've never been down this far before.

* * *

I come to work that day even brought my food still have a locker. You sent me home told me to work on my health 90 days. Don't worry about a thing you will be on short term disability. Don't worry about bills just focus on your health and hugged me. **I guess it wasn't enough to demote me cut my pay for speaking out against blatant racist ideology by Austin Green racism of which was dismissed although I seen it heard it. That wasn't enough you still dismissed me. He sent guys to cuss me out bully me. You give me your radio cause I had complained about having none same day it taken from me by a guy bullying me and I'm told I'm wrong sent home.**

That was the first time I forgave that as well as your dismissal when every worker on that shift told me something I'd never asked but that Austin green told them I had threatened a mass shooting and bombing up there. I didn't ask them they were shocked to see me. But I was dismissed told I wasn't a fit your mill by you. I was trying to make something perfect that wasn't perfect. No I simply wanted to be treated like a human being. I've worked in mills since May 05 never been wrote up, much less retaliated against for speaking out against blatant racism. And unsafe

working conditions. Of which I asked you to come see for yourself and was told I was wrong and to never do again. Funny thing being the chain of command you last one I had. Do you want to do God knows everything you said I said Austin Green said. What was done in the dark will be brought to the light.

<u>Phares</u>:  Mr. Chandler these things you are saying to me are false accusations and I don't appreciate this at all. I've been nothing but courteous, compassionate and honestly care about your wellbeing. The Standard has approved your claim but remains steadfast in waiting on medical information from your medical care team. Please devote your time and energy to talking with your medical personnel about sending in the required requested paperwork for you short term disability leave.

In the meantime unless this conversation is a direct question about your short term disability please contact me during business hours: 6am to 6pm, Monday through Friday.

Again, I will help where I can but until the medical documentation is received LP's hands are tied. Good day Mr. Chandler.

<u>Plaintiff</u>:  Accusations? These are facts but that's between you God which you claim to be following. All calls to the Standard are recorded. So is that one we had in your office the day you sent me home. You've been nothing but courteous, compassionate, and caring about my well being? That's sick no you told me upon my return to work I wasn't a fit for your mill. I asked the whole mill? Thinking you just meant flame block. You said the whole mill. You said I was trying to make flame block perfect. No I wasn't. I'd asked to stop being cussed out and threatened. **You called Austin Green into your office when I told you I was covered under the Americans with disabilities act. Told me to tell him of which he told everyone. Based on my mental diagnosis alone and his hate for me being vocal about his racism. He told everyone that I had threatened a mass shooting. That's a fact of which you dismissed.** A fact of which that whole crew told me that I didn't ask of them. So please spare me the hypocrisy and fake persona. It's vile and disgusting. **Truth is you took the side of an white supremacy supervisor and refused to listen refused to stop retaliation, discrimination, blatant racism of black workers.** My healthcare have sent the paperwork not that you care about me. I've told you before that I can't even afford basic blood pressure meds. So please stop the blame game of my medical workers. This is you.

<u>Phares</u>: Skylar after digging around – Once everything goes to The Standard – Mill HR is kinda left out. **The Standard did approve your leave 2/18 through 3/9 - Corporate received the information from the Standard on Tuesday 4/21.** Corporate Benefits did not get the paperwork to Corporate payroll until today. Payroll has processed and you will receive direct deposit 24-48 hours after Tuesday. Once I receive confirmation I will send you a pic of the amount. Also - The Standard approved Benefits through 3/9 - have your healthcare provider update dates when you can.

83.    Phares lied and said she did not read Plaintiff's text messages, and that she had no recollection of Plaintiff reporting race or disability discrimination in April 2020 or otherwise.

84.    Plaintiff was never paid the short term disability benefits he was entitled, and he avers, upon information and belief, that this was Phares' doing.

85.    Plaintiff conveyed many times over many months to LP that he was ready, willing, and able to return to work, but he was not allowed even though he did everything LP required for return-to-works status.

86.    Nonetheless, LP officially fired Plaintiff on July 9, 2020.

87.    On the date LP fired him (and before), Plaintiff was able to perform the essential functions of his job with or without accommodation, especially given that Austin Green (and his influence) left the Mill six months prior.

88.    Plaintiff has applied for numerous LP jobs for which he is qualified since LP terminated his employment. But LP has not contacted Plaintiff, or even considered him for a position, upon information and belief.

89.     As just one example, Plaintiff is certified to operate a forklift, and he did so while working for LP.  He applied for an open forklift operator position in September 2020 and was not even considered for the job.

90.     Plaintiff did, however, receive a prank call in late September 2020 from a Flame Block phone number.  The caller taunted Plaintiff and asked when he would return to work.

89.     Phares and Green knew Plaintiff engaged in the above-described statutorily protected activity, and Plaintiff avers that both were involved in the decision to order Plaintiff to leave the plant in December 2019, and in the scheme that led to his discharge.

## CAUSES OF ACTION

### Count I
### (Disparate Treatment Discrimination in Violation of the ADA)

90.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 4-6, 12-13, 16-19, 49-73, & 76-89 above as if fully repeated and set forth herein.

91.     This is a claim against Defendant for the intentional and illegal discrimination against Plaintiff because of a disability in violation of The Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq*.

92.     Plaintiff had the following disabilities (mental impairments that substantially limit major life activities) at all times relevant to the Complaint: Bi-polar

1 and Schizoaffective Disorder. As of December 2019, LP regarded Plaintiff as having these disabilities. And LP had records of Plaintiff's impairment prior to his discharge.

93.    Plaintiff was a qualified individual capable of performing the essential functions of his job with or without a reasonable accommodation.

94.    For the purposes of Count I, Plaintiff alleges he suffered the following adverse employment actions which impacted the terms, conditions, or privileges of his employment in a real and demonstrable way: (1) LP forced and/or kept Plaintiff on extended unpaid leave for many weeks (December 2019 to January 2020 and February to July 2020); (2) LP terminated Plaintiff's employment; (3) LP refused to rehire Plaintiff into a position for which he applied and was qualified.

95.    These adverse employment actions were a direct result of LP learning that Plaintiff had a disability in December 2019, and LP would not have taken these actions "but for" the fact that Plaintiff is disabled. *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1739, 207 L. Ed. 2d 218 (2020) (explaining "but for" causation and that an event may have many "but-for causes")

96.    As a proximate result of Defendant's unlawful discrimination, Plaintiff has suffered financial and economic loss, loss of employment, shame, humiliation, emotional and physical injury, distress, and physical and emotional trauma.

**Count II**
**(Retaliation in Violation of the ADA)**

97.    Plaintiff Chandler realleges and incorporates by reference the allegations

set forth in paragraphs 4-6, 12-13, 16-19, 49-73, & 76-89 above as if fully repeated and set forth herein.

98.    This is a claim against LP for illegal and intentional acts of retaliation against Plaintiff for engaging in activity protected by The Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq.*

99.    Plaintiff engaged in statutorily protected activity in December 2019 when he requested a reasonable accommodation under the ADA, and again in January 2020 when he complained to Phares about Austin Green disclosing his confidential health information. Among other incidents, Plaintiff also engaged in statutorily protected activity in April 2020 when he complained to Phares about ADA violations.

100.    Defendant knew Plaintiff engaged in this protected activity. To the extent LP alleges otherwise, Plaintiff expressly pleads that Defendant is, nonetheless, liable under the cat's paw theory based on the above-described knowledge and actions of Sundy Phares and Austin Green. *See Staub v. Proctor Hosp*., 562 U.S. 411, 415-423 (2011); *see also Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001) (applying Cat's Paw analysis to retaliation claim); *Powell v. Valdosta City Sch. Dist*., 2014 WL 5791563, at *11 (M.D. Ga. Nov. 6, 2014) (applying cat's paw in ADA context and collecting Eleventh Circuit cases).

101.    In retaliation for Plaintiff's protected activity, LP subjected him to the following materially adverse actions which would dissuade a reasonable employee from engaging in protected activity: refusing to provide safety equipment and training

and thus causing Plaintiff physical and emotional injuries; severe bullying and related mis-treatment; withholding workers' compensation information and benefits from Plaintiff and causing him to pay medical expenses for an on-the-job injury; disrupting Plaintiff's approved short term disability pay; spreading malicious lies about Plaintiff; leaking Plaintiff's confidential medical information; forcing and/or keeping Plaintiff on extended unpaid leave for many weeks; termination; and failure to hire and/or reinstate.

101.   LP's unlawful retaliation proximately caused Plaintiff to suffer financial loss, emotional distress, and other pecuniary and non-pecuniary losses for which he claims damages.

## Count III
### (Unlawful Disclosure of Confidential Medical Information, in Violation of the ADA, 42 U.S.C. § 12112(d))

102.   Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 4-6 & 49-61 above as if fully repeated and set forth herein.

103.   Plaintiff had the following disabilities (mental impairments that substantially limit major life activities) at all times relevant to the Complaint: Bi-polar 1 and Schizoaffective Disorder. As of December 2019, LP regarded Plaintiff as having these disabilities. And LP had records of Plaintiff's impairment prior to his discharge.

104.   Plaintiff and Phares, along with Austin Green, had a conversation in December 2019 during which Plaintiff discussed his confidential medical information (*i.e.*, his disabilities), and Phares made performance-related inquiries regarding the

same.

105.   Austin Green disclosed Plaintiff's confidential medical information in violation of 42 U.S.C. § 12112(d).

106.   Plaintiff suffered tangible injury as a result of this unlawful disclosure. Specifically, Plaintiff lost his home and many of his personal possessions when his in-laws learned of his medical condition.

**Count IV**
**(Retaliation in Violation of Title VII and 42 U.S.C. § 1981)**

107.   Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 4-6, 12-89 above as if fully repeated and set forth herein.

x.     This is a claim against LP for illegal and intentional acts of retaliation against Plaintiff for engaging activity protected by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. and 42 U.S.C. § 1981.

x.     Plaintiff engaged in statutorily protected activity when he reported race discrimination to Phares in approximately September of 2019. He also engaged in protected activity when he told Phares he felt his demotion was a result of his opposition to racism, and in April 2020 when he reiterated concerns about racism at LP at length in text messages, among other incidents of protected conduct.

x.     Defendant knew Plaintiff engaged in this protected activity. To the extent LP alleges otherwise, Plaintiff expressly pleads that Defendant is, nonetheless, liable under the cat's paw theory based on the above-described knowledge and actions of

Sundy Phares and Austin Green. *See Staub v. Proctor Hosp*., 562 U.S. 411, 415-423 (2011); *see also Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir.2001) (applying Cat's Paw analysis to Title VII retaliation claim).

x.     In retaliation for Plaintiff's protected activity, LP subjected him to the following materially adverse actions which would dissuade a reasonable employee from coming forward with complaints of race discrimination, including: demotion and/or pay loss; refusing to provide safety equipment and training and thus causing Plaintiff physical and emotional injuries; severe bullying and related mis-treatment; withholding workers' compensation information and benefits from Plaintiff and causing him to pay medical expenses for an on-the-job injury; disrupting Plaintiff's approved short term disability pay; spreading malicious lies about Plaintiff; leaking Plaintiff's confidential medical information; forcing and/or keeping Plaintiff on extended unpaid leave for many weeks; termination; and failure to hire and/or reinstate.

x.     LP's unlawful retaliation proximately caused Plaintiff to suffer financial loss, emotional distress, and other pecuniary and non-pecuniary losses for which he claims damages.

### PRAYER FOR RELIEF

For each of the claims above, Plaintiff Skyler Chandler seeks declaratory and injunctive relief, an award of back pay, reinstatement (or front pay in the event reinstatement is deemed inappropriate), compensation for loss of benefits and other

make-whole relief, pre- and post-judgment interest, compensation for loss of career opportunities, compensatory and punitive damages for mental anguish and physical injury, attorneys' fees, costs, expenses, and any and all such other relief deemed appropriate.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests all relief set forth within, plus such other and further relief this Court deems just and proper.

PLAINTIFF DEMANDS TRIAL BY STRUCK JURY

Respectfully submitted,

_____
Brian O. Noble ASB-9735-R39N
Attorney for Plaintiff

OF COUNSEL:

CAPSTONE LAW, LLC
3105 Sunview Drive 43888
Vestavia, Alabama 35243
Phone: (205) 578-1210
Fax: (205) 484-9974
E-mail:  brian.noble@caplawllc.com

**DEFENDANT TO BE SERVED**
**BY CERTIFIED MAIL AT:**

**Louisiana-Pacific Corporation**
**641 S Lawrence St**
**Montgomery, AL 36104**