IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SKYLER CHANDLER,                    )
    Plaintiff,                       )
                                     )
v.                                  )        CIVIL ACTION: 1:21-00341-KD-C
                                     )
LOUISIANA-PACIFIC CORPORATION,      )
    Defendant.                       )

**ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (Docs. 45-48, 50), Plaintiff's Response (Docs. 52-53), and Defendant's Reply (Docs. 54-55).

**I.**  **Findings of Fact**[1]

This litigation stems from Plaintiff Skyler Chandler (Chandler)'s employment with Defendant Louisiana-Pacific Corporation (LP) in Clarke County, Alabama from August 19, 2019 to July 9, 2020.  Chandler is a Caucasian male who suffers from a mental disability -- bipolar and schizoaffective disorders.  (Doc. 53-1 at 4 (Dep. Chandler at 15)).  Per Chandler, he is a "well balanced" and a very private person, who is able to work with others without anyone knowing that he has these conditions.  (Id. (Dep. Chandler at 158)). Chandler also self-describes as "a tattooed, bald-headed man living in rural Alabama... stereotyped by racists as someone who must also be

---

[1] The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).  Even so, however, any alleged "facts" which are not relevant to Chandler's claims in this case have not been considered on summary judgment (e.g., naming Green and Phares "bad actors in a separate multi-plaintiff lawsuit" pending before another judge in the SDAL (CV 20-582-JB-C) without any indication as to how they are relevant to establish a *prima facie* case of discrimination or retaliation for Chandler (Doc. 52 at 4 at note 5)).

racist.  I am not."  (Doc. 1-1 at 4 (EEOC Charge)).  At the relevant time, no one knew about his condition except his wife and doctor.  (Id. (Dep. Chandler at 157-158)).

On **August 12, 2019**, Chandler's employment with LP officially began at the Clarke County mill in Thomasville, Alabama. (Doc. 46-2 at 3 (Decltn. Gipson-Vincent[2] at ¶6); Doc. 53-1 at 10 (Dep. Chandler at 78, 80-81)).  At the time, LP's Thomasville Plant Manager was Jim Motes (Motes) (Caucasian male) (Doc. 53-3 at 4 (Dep. Phares at 60)); LP's FlameBlock (FB)[3] Supervisor was Austin Green (Green) (Caucasian male) and supervised Chandler (Doc. 1-1 at 4 (EEOC Charge)); and LP's HR Manager was Sundy Phares (Phares) (Caucasian female).  Phares interviewed Chandler for the position.  (Doc. 46-1 at 6 (Dep. Chandler at 71)).  While Chandler was initially hired as a "Utility II" position, he also later worked as follows: September 6-November 27, 2019 and December 1-10, 2019 Water Treatment Operator; November 30, 2019 Utility II; and January 12, 2020-January 24, 2020 Forklift Operator. (Doc. 46-2 at 6 (Decltn. Gipson-Vincent); Doc. 46-2 at 88-106 (Chandler's employee record)).

For the first three (3) days of employment, Phares conducted Chandler's orientation and then LP's Environmental Health and Safety Manager Daniel Capers (Capers) trained him on safety. (Doc. 46-1 at 6-7 (Dep. Chandler at 71-73)).  Phares communicated LP's policies, including policies on anti-retaliation, attendance, equal employment opportunity, confidential reporting, rehire and reinstatement, and the process for disabled persons to request reasonable accommodations. (Doc. 46-2 at 3-5 (Decltn. Gipson-Vincent at ¶¶7-19 and Ex. B). The orientation

---

2 LP's current Human Resources Manager at the Clarke County facility.  (Doc. 46-2 at 2 at ¶2).

3 A division, and an area, of the facility where FlameBlock boards are produced.

covered employer-provided benefits, including short-term (STD) and long-term disability (LTD), provided by a third party, The Standard.[4] (Id.)

On **August 19, 2019**, Chandler's first day working as a Utility II veil cutter began in the FlameBlock[5] division. (Doc. 46-1 at 7-8 (Dep. Chandler 73, 78); Doc. 53-1 at 10 (Dep. Chandler at 80-81). Chandler worked in FlameBlock on the day shift (5:00 a.m.-5:00 p.m.), initially for FB Supervisor Green, then for FB Supervisor Kelvin Lewis (Lewis), as well as for Jimmy Bridges (Bridges). (Doc. 46-1 at 7-8, 11-12 (Dep. Chandler at 73, 78, 81-82, 84, 216); Doc. 46-3 at 5 (Dep. Green at 74)). Chandler worked in this capacity for three (3) weeks (Doc. 53-1 at 10 (Dep. Chandler at 79-81); Doc. 46-2 at 5-6 (Decltn. Gipson-Vincent at ¶20 and Ex. C); Doc. 46-1 at 9 (Dep Chandler at 79)).

Shortly thereafter, **also in August 2019**, Chandler asked Supervisor Green about a fellow employee. (Doc. 51-1 at 19 (Dep. Chandler at 126-129)). Chandler went into Supervisor Green's office, where employee Stevie Overton (Overton) was also present, and asked if employee Jamarus Norwood was a good trainer; Green responded that he was a liar, not good to be around, evil, and that if he worked for him to watch his back, adding that "blacks are demon servants and good for laughs." (Doc. 46-1 at 35-41 (Dep. Chandler at 124-130); Doc. 53-1 at 29-30, 55 (Dep. Chandler at 169-171, 173, 270-271 (Ex. 6, CL00023-CL00024)); Doc. 1-1 at 4 (EEOC Charge); Chandler was "shocked" as he had "never experienced that in all my life in any job[]" and asked him what

---

4 "The Standard" is a third-party benefits administrator for LP's short and long term disability benefits. (Doc. 46-4 at 15 (Dep. Phares at 316)).

5 A forklift would bring "OSB board" and load them into a line, the line would go down the sander and then the product called "the FlameBlock" would come in what is called a slurry coater, that would be sprayed on the board, and then a veil of fiberglass would roll onto the board. (Doc. 46-1 at 9 (Dep. Chandler at 79)). And in between the lines would be a gap and Chandler used pole with a razor " to slice that fiberglass in between the boards to separate them (i.e., a veil cutter). (Id. at 10 (Dep. Chandler at 80)).

he said and Supervisor Green repeated himself.  (Doc. 46-1 at 39-40 (Dep. Chandler at 128-129)).

Chandler asked Supervisor Green why he had black employees to his home on the weekends if he

felt that way, and he responded he did so to mock, laugh at, and make fun of them when they drank

too much.  (Id. at 40 (Dep. Chandler at 129); Doc. 1-1 at 4 (EEOC Charge)).   Chandler told

Supervisor Green not to speak to him like that - "that I don't believe like that[]" -- "[d]o not speak

like that around me."  (Doc. 46-1 at 61, 63-64 (Dep. Chandler at 169, 172-173)).   Chandler left

Supervisor Green's office, did his job, and went home.  (Id. at 41 (Dep. Chandler at 130)). Chandler

did not hear Supervisor Green make racial comments again.  (Id. at 43-44 (Dep. Chandler at 138-

139)).   Supervisor Green disputes all of Chandler's racial allegations.  (Doc. 46-3 at 8-10 (Dep.

Green at 75, 84-85)).

     In **August 2019,** Supervisor Green discussed Supervisor Lewis with him, the result of

which was that on **August 30th** Chandler submitted a false statement about Lewis to Phares,

asserting Lewis had committed a terminable offense. (Doc. 46-1 at 25-29 (Dep. Chandler at 98-

102); Doc. 46-1 at 137-138 (Def's Ex. 1); Doc. 46-4 at 8-9 (Dep. Phares at 268-269, 309); Doc.

46-6 at 6 (Def's Ex. 3 to Lewis Dep. (Incident Report))).[6]   On **September 1, 2019,** Phares talked

to Chandler about his statement about Supervisor Lewis. (Doc. 46-1 at 30-31 (Dep. Chandler at

110-111)).   Thereafter in **September 2019,** Chandler told Phares that his statement about

Supervisor Lewis was false.  (Id. at 132-133 (Dep. Chandler at 343-344)).   Chandler also

---

     6 On **August 20, 2019**, Supervisor Green noticed trash on a table in the FB breakroom and started
talking about how nasty Supervisor Lewis was, telling Chandler to watch his back as Lewis "had gotten in
a lot of trouble preying on women in a sexual-predator-type fashion and that he was also a known domestic
abuser of women[.]" (Doc. 46-1 at 13-18 (Dep. Chandler at 84-89); Doc. 46-2 at 88 (Ex. C to Decltn.
Gipson-Vincent - indicating that Chandler's second day on the floor was 8/20)). Supervisor Green had
coached Chandler to believe that Lewis was a "sexual predator "and a "domestic abuser of women and
trouble and he was going to cause [him] a lot of problems." (Doc. 46-1 at 31-32, 134 (Dep. Chandler at
111-112, 344); Doc. 46-1 at 137-138 (Def. Ex. 1)).

apologized to Lewis--"I wrote this up under duress from ... Green ... he's authority over me. Told me that's what ... needed to be done. And I had bills to pay....I regretted it. I did ....wrong."  (Id. at 32 (Dep. Chandler at 112)).

Nevertheless, believing that Supervisor Green was rewarding him for having submitted the false statement about Lewis, in **early September 2019** Green asked Chandler if he wanted to replace an employee leaving the Water Treatment area as an Operator, which would be "more money." (Id. at 34 (Dep. Chandler at 117)).  Chandler said he did and he "went from veil cutter to water treatment[]"on **September 6, 2019**. (Id.; Doc. 46-2 (Decltn. Gipson-Vincent at ¶6)). Chandler's position was still Utility II. (Doc. 46-2 (Decltn. Gipson-Vincent at ¶¶ 6, 20-22; Doc. 46-3 at 5 (Dep. Green Dep. 74)). Chandler also testified, however, that he believed that he obtained the Water Treatment position after an employee quit on short notice and because he was the "golden child" of Water Treatment and excelled in his position.  (Doc. 53-1 at 43 (Dep. Chandler at 222-223)).

Also in **September 2019**,[7] about one (1) week after the interaction with Supervisor Green and Overton in Green's office (Doc. 2 at 5-6), Chandler reported race discrimination to Phares (Supervisor Green's comments and that he had "set up" African American employees for termination).  (Doc. 46-1 at 119, 132, 134 (Dep. Chandler at 287, 343, 345)).  Chandler alleges Phares "didn't want to hear about it[]" and "did not ask any questions or do any investigation." (Id. at 119-120 (Dep. Chandler at 287, 289)).  Per Chandler, Phares did not believe he was telling the

---

7 Chandler inadvertently references his dates of employment incorrectly in the charge (e.g., as commencing employment in April 2019). The Court has used the dates of employment verified by the evidence of record.

truth stating Green was not "like that."  (Id.)  Chandler described what he reported to Phares in his

EEOC Charge as follows:

> I went to Sundy Phares in HR and reported that there was race discrimination
> occurring in the plant. She didn't want to hear about it. Ms. Phares did not ask any
> questions or do any investigation. In fact, Phares tried to hurry me out of the office.
> But I wanted to give her an example so I told Ms. Phares about Brian Williams
> (African- American). Mr. Williams was a great worker. I personally witnessed
> Green fire Williams for a bogus reason only to replace him with an unqualified
> white kid barely out of high school. I was present for the purported "problem" that
> Green used as a pretext to fire Williams, which was in no way Williams' fault or
> responsibility. I observed Green do something very similar with my African-
> American co-worker Charles, who Green literally set up (I have personal
> knowledge of this) for termination only to replace him with a white kid, again
> barely out of high school. Racial discrimination at LPC was pervasive, and it was
> reflected not only by Green's comments about "black demons," but also in racist
> hiring and disciplinary practices. Put simply, whites received way better treatment
> than African-Americans. But Phares did not appear to care about racism at LPC.

(Doc. 53-1 at 55 (Dep. Chandler at 270-271 (Ex. 6, CL00023-24); Doc. 53-1 at 132 (EEOC

Charge)).

Shortly after he reported race discrimination Chandler argues that his work environment

became "intolerable" and "drastically changed."  Caucasian employees Stevie Overton (Overton)

and Brent Newton (Newton), began bullying and "dehumaniz[ing]" Chandler -- "cussing" him out

and "routinely accosted, threatened, demeaned, and targeted" him for months.  (Doc. 53-1 at 18,

26-33 (Dep. Chandler at 125, 156-157, 159, 161-163, 166-169, 173-175, 179-182)); Doc. 46-1 at

65, 67-68 (Dep. Chandler at 174, 178-179) (Newton removed his ability to communicate with the

main mill by taking his radio, would "constantly be grabbing himself in the private area and stuff[]"

and said "I wasn't qualified to clean the floor .... that I'm not doing my job[]").  (Id.) Chandler

testified that Overton started bullying him after Chandler told Overton and Supervisor Green that

he did not believe "in the racist ideology and culture and stuff." (Doc. 46-1 at 61 (Dep. Chandler at 169)).

Chandler and a coworker, "Big Lewis," complained about Overton's behavior to Supervisor Green (and nothing happened) and to Supervisor Lewis (who said he would take care of it). (Id. at 166-167). Chandler testified that after his complaint to Supervisor Lewis, Overton still bullied him by lying about Chandler and Big Lewis not doing their jobs. (Id. at 167-169). When asked for specifics about Overton,  Chandler testified that one morning it was really messy in Water Treatment when an employee named Jonathan "Big" Lewis (Big Lewis) who was 19 and "right out of high school" left concrete in the tank, Overton was having a "fit" and called him a "sorry POS" saying that the best thing LP could do "is put a bullet in his GD head." (Id. at 28-29 (Dep. Chandler at 162-166)). Chandler complained several times to Supervisor Green about Overton.  (Doc. 53-1 at 27-28 (Dep. Chandler at 161-162)). Supervisor Green met with Overton and Chandler, and Overton denied doing anything wrong, said he was stressed out, and that they could work it out. (Id.). Supervisor Green took Overton's side, believing that Chandler provoked Overton, and told him to apologize; although he did not know why. (Id.).

On **October 10, 2019**, Chandler was issued a Corrective Action Report, which he signed, reflecting discipline for his four (4) absences during his probationary period, adding that his "attendance must improve in order to prevent further corrective actions from occurring[]" and which indicated that further discipline including termination could result if he failed to improve attendance in keeping with LP's Attendance policy. (Doc. 46-1 at 139-140 (Def's Ex. 2)).

On **Friday, December 6, 2019**, Chandler went to his medical provider, via nurse practitioner Anna Brooks (Brooks), to discuss getting back on medication for his bipolar disorder.

(Doc. 53-6 at 4 (Dep. Brooks at 55-57); Doc. 47-2 SEALED at 8).  Chandler had worked an 11.25 hour shift that day at LP. (Doc. 46-2 at 94).  From **Sunday December 8, 2019** to **Tuesday December 10, 2019**, Chandler worked 11.5 hour shifts each of those three (3) days.  (Id.)

At some point -- in **December 2019** -- Chandler met with Phares to ask her "to stop abusive behavior in the workplace" with regard to the bullying by Overton and Newton ("cuss[ing] him out and dehumaniz[ing] me") -- "I went to her....to get help." (Doc. 46-1 at 47-49, 67-69, 71, 108-109 (Dep. Chandler at 155-157, 178-180, 182, 254-255)).  Chandler reported that while the bullying was impacting his ability to do his job, he did not want to leave and was capable of performing his job, and "just wanted workplace abuse to stop[.]" (Doc. 53-1 at 26 (Dep. Chandler at 154-156); Doc. 52 at 7).  On that day Newton had taken Chandler's radio meaning that Chandler could not communicate with the mill -- "[t]hat's the original reason why I went to her that day[.]" (Doc. 46-1 at 69 (Dep. Chandler at 180)). Per Chandler, because he had already complained "multiple" times to "supervisor-level personnel to no avail[,]" he finally reached out to Phares. (Doc. 53-1 at 27-30 (Dep. Chandler at 160-162, 166-169)).  Chandler alleged in his Amended Complaint that he told Phares he was experiencing extreme bullying on a daily basis because he spoke up about race discrimination.  (Doc. 2 at 9 at ¶52).

During this meeting Chandler also told Phares that he was covered under the ADA and that he was bipolar and had been diagnosed with schizoaffective disorder: "I told .. Phares that I wanted her to know that I was covered under the Americans With Disabilities Act, that I wanted to give her my mental health diagnosis, and I did. I told her that I don't like confrontation." (Doc. 46-1 at 49 (Dep. Chandler at 157)). Chandler alleges that he was making a request for a reasonable accommodation under the ADA at that time.  (Doc. 2 at 8 at ¶49).  As alleged in the Amended

Complaint Chandler told Phares that his disabilities negatively impact his ability to cope with daily severe conflict and confrontation -- such as the workplace abuse he was experiencing -- and he would accept any accommodation to lessen the abuse (transfer, other schedule, work in a different area).  (Id. at 9 at ¶52-53).

Chandler testified that Phares then said that "we needed to call ... [Supervisor] Green into the office and that I had to tell him my diagnosis. And I told her that other than my wife, nobody .. besides my doctor ... knew my status." (Doc. 46-1 at 49-51 (Dep. Chandler at 157-159)).  "I told her that I didn't really feel comfortable with it. But she said since he [Supervisor Green] was over me [his Supervisor] that he needed to know about it."  (Id. at 51 (Dep. Chandler at 159)).  Per Chandler, Phares asked Supervisor Green into the office "*made me tell* him my diagnosis ....after I had ... reported him...."  (Doc. 46-1 at 50 (Dep. Chandler at 158)).  Chandler also testified that "*she* told Austin that .... I was diagnosed as a bipolar and schizoaffective disorder." (Doc. 53-1 at 27 (Dep. Chandler at 160-161)).  Phares testified *she* did not tell Supervisor Green that Chandler was bipolar or schizophrenic.  (Doc. 46-4 at 20 (Dep. Phares at 326)).

Following the meeting, Supervisor Green brought Chandler paperwork "for me to sign ... We didn't really discuss anything." (Doc. 46-1 at 45 (Dep. Chandler at 153)). Immediately, "I was off work for a long time of not on my own accord or my own will[]" -- he was sent home the same day he met with Phares and reported his ADA disability.  (Id. at 46 (Dep. Chandler at 154)). Chandler was "forced home" yet had no desire to leave his job for even a temporary period of time on short-term disability.  (Id. (Dep. Chandler at 16, 30, 43, 212, 198, 202)). "I was sent home that day."  (Id. at 71, 85 (Dep. Chandler at 182, 202)). "I was sent home after I told her my mental condition, my mental health condition, that day[]" and I was sent home "[a]gainst my will."  (Id.

at 72 (Dep. Chandler at 183)).  "She told me that I had to go home and work on my health, that I would be on short-term disability, that I would get sixty percent of my pay."  (Doc. 46-1 at 85 (Dep. Chandler at 202); Doc. 53-1 at 37 (Dep. Chandler at 198)).  Chandler testified that Phares told him "I needed to go home and work on myself, that I would be on short-term disability, which never came ... so I went to the doctor to ask her if I needed some more meds because I was trying my best to get to work because I needed to work[.]"  (Doc. 46-1 at 81-83 (Dep. Chandler at 197-199); Doc. 46-1 at 160 (Def's Ex. 3 texts)); Doc. 47-2 (SEALED).  Chandler wanted meds "to convince her that I could ... come back to work[]" (Doc. 46-1 at 82 (Dep. Chandler at 199)).

Phares disputes that Chandler did not ask for and did not want medical leave -- "[t]hat's not true[,]" and referencing how she *generally* talks with an employee about a personal problem and discussing leave (not specific to Chandler). (Doc. 46-5 at 19 (Dep. Phares at 323)).

On **December 7, 2019**, Chandler -- *apparently already off work* -- texted FlameBlock Supervisor Jimmy Bridges (Bridges).  (Doc. 53-1 at 79 (texts)).  On **December 8, 2019**, Jimmy responded, asking if Chandler would be returning to work the next day. (Id.)  Chandler texted Bridges that he had been "trying to get a hold of" Phares "to let her know that the nurses are working to get my meds for me. They aren't in yet might come tomorrow. Is it ok with her if I come back tomorrow even though I am still waiting for medical help meds ... haven't been able to reach her I don't know how the FMLA stuff works." (Id.) "Wish I was working." (Id.)  Chandler added that he left Phares voicemails but had not heard back and that she was talking about him taking short term disability but "I don't want that[]" and "if you hear anything about work let me know[]" because "I just need to be working."  (Id. at 81)  Later Chandler texted, "[i]f she wants me on the short term I'll do it but that should be reserved for actual people who can't work in my

10

opinion[]" and "if I'm allowed I'd like to be working[.]" (Id. at 83-84).  From **Sunday December 8, 2019** to **Tuesday December 10, 2019**, Chandler worked 11.5 hour shifts each of those three (3) days.  (Doc. 46-2 at 94). On **December 13, 2019,** Chandler texted Bridges notifying him that his mother-in-law "caught word" about him being out of work and "raise utter hell[.]" (Doc. 53-1 at 83). Chandler texted Bridges on **December 14, 2019** asking if he had heard anything from Phares because he had "[c]alled text left voicemail at work I need to know what she wants I applied for the short term disability thing. I don't want that but I need to know what's up." (Id. at 85-86). Bridges responded that Phares wanted Chandler to meet with her Tuesday morning [December 17, 2019]. (Id. at 86).

By **December 17, 2019,** Chandler had asked his medical provider Brooks to contact Phares to speak on his behalf so he could hopefully keep his job. (Doc. 53-6 at 4 (Dep. Brooks at 55-57); Doc. 47-2 SEALED at 7). Per Brooks' medical record, Chandler had not started taking his meds yet "because he was afraid his employer would not allow him to return to work while being on medication." (Doc. 47-2 SEALED at 5)). As of this date, Brooks had spoken with Phares to inform her she had nothing to worry about regarding Chandler harming himself or anyone else, and that he should return to work. (Doc. 53-6 (Dep. Brooks at 55-63)). Brooks told Phares that Chandler was going to start on new medicine and that he could return to work January 6th even though "there's really no clinical reason to hold him [off work] two weeks[]" other than to ensure he does not have a reaction. (Id. (Dep. Brooks at 63)).

Thereafter, in texts between Bridges and Chandler from **December 18, 2019-January 2, 2020,** Chandler was consistently unable to reach Phares to get information about being off work, his STD leave or benefits, even though he "didn't ask to be out like this[,]" "I need to get back to

work[.]" (Doc. 53-1 at 89-91). Chandler's frustration is evident in a **January 2, 2020** text to Bridges: "I don't know what is going on but at some point I need answers how was I told I'd was accepted on short term disability which I didn't ask for only to not be on it and not get paid? And never get my calls answered? I'm having to take out a loan just to feed the animals we got I need to know asap what the deal is or what I've done to be treated like this?" (Id.)  And per Chandler, after the December meeting with Phares, he "kept begging to come to work. I never wanted to leave work." (Doc. 46-1 at 72 (Dep. Chandler at 184)).

The Standard Insurance Company was notified of Chandler's leave on **December 10, 2019**, for medical illness (episodic mood disorders). (Doc. 47-1 SEALED at 5-6 (The Standard Ins. Co. LP-02388-2389)). On **December 11, 2019**, Chandler started an STD leave from LP for bipolar disorder and schizophrenia, with an expected return to work of **January 6, 2020**. (Doc. 46-1 at 141-142 (Def's Ex. 4 (CL000066-67); (Doc. 46-1 at 94-96 (Ex. C to Decltn. Gipson-Vincent-Time Sheets LP00062-64); (Doc. 46-7 at 13 SEALED (Fulton Family Med. LP-02358)). From **December 11, 2019-January 2, 2020**, The Standard attempted to get medical documentation from Chandler's medical provider to support his claim for STD benefits. (Doc. 47-1 SEALED at 9-11 (The Standard Ins. Co. LP-02418-20)). On **January 2, 2020,** The Standard contacted Chandler's medical provider because it had still not received necessary documentation, though Chandler stated it had been sent multiple times. (Doc. 47-1 SEALED at 7 (The Standard Ins. Co. LP-02395)). The Standard received a completed APS via fax that same day indicating that Chandler's medical provider recommended he be off work beginning December 6 and returning to work on January 6, 2020. (Doc. 47-1 SEALED at 11-13 (The Standard Ins. Co. LP-02356, 02358)). The Standard approved Chandler's STD claim for benefits, with benefits beginning December 18, 2019 (after

the requisite seven (7) day waiting period) through January 5, 2020. (Doc. 46-1 at 141-142 (Def's Ex. 4 CL000066-667)). The Standard notified Chandler that if he could not work after January 5, his doctor would need to provide additional documentation. (Id.) Chandler's time sheets reflect that he was paid 102.88 hours of STD as approved by The Standard. (Doc. 46-2 (Decltn. Gipson-Vincent at ¶¶23, 26)). As of **January 4, 2020,** Chandler had qualified for STD benefits but had not been paid any (he was only later paid for 102.88 hours of STD benefits). (Doc. 46-2 at 6 (Decltn. Gipson-Vincent)).

Moreover, Chandler asserts that while he was off work, Supervisor Green improperly disclosed his disabilities to workers.  (Doc. 53-1 at 5, 50-51 (Dep. Chandler at 35, 253, 257)); Doc. 46-1 at 103 (Dep. Chandler at 257)). Per Chandler "everyone" knew about his disability, including his in-laws who became scared of him and kicked he and his family out of the home he was living him, devastating his physical/financial security and the health of his marriage -- his wife's brother "didn't mean to tell ... the in-laws that I wasn't at work, but he accidentally did[.]"  (Doc. 53-1 at 5, 45 (Dep. Chandler at 34-37, 231-232); Doc. 46-1 at 94-95 (Dep. Chandler at 231-232)).

Supervisor Lewis testified that Supervisor Green disclosed Chandler's mental health condition to him, stating that Phares had told him, and Lewis stated that Phares was in violation of HIPAA.  (Doc. 53-2 at 6-7 (Dep. Lewis at 318-319); Doc. 53-1 at 45-46 (Dep. Chandler at 233-234); (Doc. 46-6 at 3-4 (Dep. Lewis at 318-319)). Supervisor Lewis told Chandler it was obvious that Phares and Supervisor Green were working together to force him out of a job.  (Doc. 53-1 at 74 (Dep. Chandler at 347)). Per Supervisor Lewis, an hour after the meeting with Chandler in December 2009, he was walking through the mill, and "I got people stopping me asking...I heard that Skyler guy going to come back and shoot the mill up. What's going on..."  (Doc. 46-6 at 4

(Dep. Lewis at 319)). Chandler then surmises, without admissible evidence, that Supervisor Green told everyone that Chandler was schizophrenic, on medication, and had threatened a mass shooting. (Doc. 46-1 at 96 (Dep. Chandler at 233)).

On **January 6, 2020,** Chandler returned to work with medically cleared documentation. (Doc. 46-2 at 96; Doc. 46-1 at 162 (Def's Ex. 3 CL000244 texts); Doc. 48 at 4; Doc. 53-1 at 51 (Dep. Chandler at 257)). Upon his return from this approved STD leave, Chandler had a meeting with Phares and Joe Gage (Gage), FlameBlock Area Manager. (Doc. 46-1 at 74 (Dep. Chandler at 185-186); Doc. 53-1 at 33-34 (Dep. Chandler at 185-186)).

At this meeting, Chandler told Gage and Phares that Supervisor Green had told everyone that he had threatened a mass shooting -- that he had falsely accused him of planning a shooting, and that his mother-in-law had also learned about his medical diagnosis. (Doc. 53-1 at 45 (Dep. Chandler at 231-233); Doc. 46-1 at 103 (Dep. Chandler at 257)). Phares dismissed it (id.) and Gage said nothing. (Id. at 187). Instead of addressing this issue, Phares communicated to Chandler that he was "not allowed back at water treatment." (Doc. 46-1 at 73 (Dep. Chandler at 185)). Phares told Chandler that LP would not be firing him, but he was not a "fit" for any job in the mill. (Id. at 33-34, 36, 51 (Dep. Chandler at 185-187, 194, 256)). "You're not a fit for out mill. We're not going to fire you. But you're not a fit here. You're trying to make it perfect here." (Id. at 74 (Dep. Chandler at 186)). Chandler told Gage and Phares that he was not trying to make it perfect but just wanted to be treated equal, like a human being. (Id.) Phares told Chandler they had "a specific job" for him instead, and to go to the FlameBlock area and Gage walked him there and told him to unload chemicals from trucks with a forklift and stack them (something he had never done before) because "he needed to test me." (Id. at 75-77 (Dep. Chandler at 187-189)). Chandler did this work

14

-- that he knew nothing about -- for three (3) days and then returned to his veil cutter role and "got my feelings hurt .... workers didn't expect me to come back ... they looked afraid of me...I asked them ... what was going on." (Doc. 46-1 at 78, 79 (Dep. Chandler at 190, 194); Doc. 46-2 at 96)). Chandler surmises that Gage was "testing" him for mental health wellness by forcing him to complete rigorous work. (Doc. 46-1 at 34 (Dep. Chandler at 188-189)).

On **January 8, 2020,** The Standard issued a letter to Chandler approving his disability claim. (Doc. 46-1 at 141-147)). The Standard noted he became disabled on December 11, 2019 and benefits would be payable from December 18, 2019, and that his doctor estimated a return to work after January 5, 2020 at which time his claim will be closed. (Id. at 142)). The Standard stated that if he was unable to return to work on January 6, 2020, a mental health report will be needed. (Id. at 143).

Chandler worked 26 shifts from **January 6 - February 14, 2020.** (Doc. 46-2 (Ex. C to Decltn. Gipson-Vincent (LP 00064-666); Doc. 46-2 at 96-98). On February 15, 2020, (Doc. 46-2 at 98), per Chandler, he went to see Phares (does not recall the reason why) but ended up asking her "why things went the way they did[]" -- "[w]hy I wasn't allowed to a job that I did to perfection [in water treatment] up until the time that I went and seen her [in December 2019] and was sent home." (Doc. 46-1 at 88 (Dep. Chandler at 220, 222)). "I was the golden child out there, I thought. I was the only one that could do that job for a long time. Why did my pay have to be cut, why I have to be demoted?" (Id. (Dep. Chandler at 223)). Chandler told her "[i]t's not fair." (Id.) Chandler did not recall Phares' response other than that she said again that the mill was not perfect and he was trying to make it perfect. (Id.) Chandler testified that he then said the "random" comment that "[i]t's enough to make somebody want to go home and drink." (Id. (Dep. Chandler

at 220-224)). Per Chandler, Phares then "turned that around on me." (Id.) "She asked me if I had an alcohol problem[,]" and "I told her no[]" and that "I might have a drink once every two months or something... for something celebratory[]" but "[s]he continued to lecture me about alcohol ... and that ... the best thing for me to do was to go get some treatment." (Doc. 46-1 at 91-92 (Dep. Chandler at 224-225)). Phares sent Chandler home after she accused him of substance abuse issues, telling him that he "needed to get treatment or something[]" -- "she came up with the idea that I had to go to treatment. And I thought I was obligated to do that to keep working there." (Doc. 46-1 at 87-90 (Dep. Chandler at 220-223)). To Chandler, he was "thinking that I could get back to work again[]" if he just went to alcohol treatment. (Doc. 46-1 at 92 (Dep. Chandler at 225)). "I did not ask for leave, I did not want leave, and I was capable of performing my job. And to be clear, I was not abusing alcohol." (Doc. 53-1 at 133 (EEOC Charge)).

In contrast, in his EEOC Charge, Chandler reported his need to self-medicate with alcohol due to the bullying at work which exacerbated his mental health issues and impacted his job, and that he asked Phares for help to stop the workplace abuse. (Doc. 53-1 at 133 (EEOC Charge)). Additionally, per Phares, "[h]e told me he had an alcohol problem[]" and "needed to get some attention." (Doc. 53-3 at 6 (Dep. Phares at 314); Doc. 46-4 at 11 (Dep. Phares at 312)). Moreover, Chandler's medical provider (NP Brooks) documented in his **February 17, 2020** medical record that "[h]e states [self-reported] he has a long history of drinking alcohol ... he binge drinks on the weekends... nothing to look forward to other than drinking... he reports drinking 8-12 cans of 'twisted tea'... per day... has been to rehab in the past and it 'didn't work[]'")). (Doc. 47-1 SEALED at 14 (LP-02361)). "He is in agreement to go to therapy/detox/ or whatever option he has." (Id. at 14). The medical records further indicated that Chandler reported that he had stopped taking his

bipolar medication because he did not think it was working. (Id. at 14). Chandler was referred to detox  (Id. at 15).

On **February 17th**, Chandler texted Phares and Bridges stating his doctor had sent him to Jackson Hospital. (Doc. 46-1 at 161, 164 (Def's Ex. 3 texts (CL000238, CL000246)). Chandler then went to Jackson Medical Hospital, which had a two (2) week detox drug/alcohol program, where he spoke with nurse practitioner Anna Brooks (Brooks) and rehab arrangements were made to commence **February 17th.**  (Doc. 46-1 at 92-92 (Dep. Chandler at 225-226)). Chandler began an STD leave of absence. (Doc. 46-1 at 148 (Def's Ex. 5 (CL00074)). The Standard approved this STD leave from **February 18 to March 9, 2020.** (Doc. 46-1 at 149 (Def's Ex. 5 (CL00075)).

The medical record of Sid S. Crosby, M.D. notes Chandler's history:

> HISTORY: 33-year-old man from the Thomasville area who presents to detox from alcohol. Mr. Chandler has used alcohol socially all his life but about a year & a half ago he was involved in  an 18 wheeler accident where he suffered fractures of ribs, back & other bones. Following his injury he turned to alcohol & has become a binge weekend drinker. So far he says that he does not drink during the week & it has not severely interfered w/ his work but is destroying his family life & social life. He also fears that the alcohol will kill him. He does not use any illicit drugs. He does not smoke cigarettes.

> PAST MEDICAL HISTORY: 1) Schizoaffective disorder. 2) Bipolar type I. He is on no medications for that. 3) Hypertension, takes Losartan.

(Doc. 47-1 SEALED at 16 (LP-02366)).  Dr. Crosby's impression was alcohol addiction, abuse, and withdrawals, in addition to schizoaffective disorder and bipolar type 1.  (Id.)  The plan was to admit Chandler "for detoxification."  (Id. at 17). On **February 24, 2020**, Chandler was discharged

from treatment, at which time Dr. Crosby stated "Skylar came in w/addiction to Suboxone. He did well w/detoxification[.]" (Id. at 19 (LP-02369)); (Doc. 46-1 at 98 (Dep. Chandler at 236)).

On **Wednesday February 26, 2020,[8]** Chandler returned to work at LP for about 1.5 hours (Doc. 46-2 at 98). He later texted Phares "I want to thank you for being understanding today[]" because she had "hugged my neck and told me to go home and work on myself. I thought she was being sincere. I didn't have any idea that I was being done like I was going to be done....I thought ...she wanted to help me." (Doc. 46-1 at 97 (Dep. Chandler at 235); Doc. 46-1 at 164 (Def's Ex. 3 texts (CL000246)); Doc. 46-2 at (Decltn. Gipson-Vincent- Ex. C (LP 00066))). "In her mind, I had an alcohol problem and she wanted me to get treated. And I did what she asked me to do[]" - - "I was trying to tell her anything and everything possible to get back to work because I needed to get my job back." (Doc. 46-1 at 98 (Dep. Chandler at 236)). Per Chandler, Phares sent him home "to work on my mental health or my health ninety days. Don't worry about a thing. You'll be on short-term disability. She told me .... Focus on my health. Hugged me." (Doc. 46-1 at 106 (Dep. Chandler at 252)).

On **February 22, February 29, March 7,** and **March 14, 2020,** Chandler was on STD leave -- but was only later paid 120.03 hours of STD benefits. (Doc. 46-2 at 6 (Decltn. Gipson-Vincent at ¶24); Doc. 46-2 at 98-99)). Chandler was thus paid STD benefits by LP through March 14, 2020. (Id.)

From **March to April 2020**, Chandler reached out to Phares via texts numerous times about disability pay (Doc. 53-1 at 105-123 (CL000248-266)):

- Chandler called The Standard on **March 12th and 27th**, and **April 1st, 7th, and 8th** to check on the status of his STD payments, and each time The Standard told him that

---

8 The notation on Chandler's employee record and time sheet for LP indicates that as of this date, "S.Chandler is on STD through June 2020." (Doc. 46-2 at 98).

it was waiting for the APS from his medical provider. (Doc. 46-1 at 104 (Dep. Chandler at 250).

- On **March 18, 2020,** Chandler texted Phares that he was sick with respiratory problems (sounding like he believed he had COVID and on **March 26th** he was still sick and was trying to figure out his STD.  (Doc. 46-1 at 104 (Dep. Chandler at 250); Doc. 46-1 at 165)).

- From **March 11 to April 27**, Chandler and Phares exchanged texts, and Phares was trying to reach The Standard as well. (Doc. 46-1 at 165-183).

- On **March 11, 2020**, Phares told Chandler that The Standard needed additional documentation -- "Skyler your physician MUST submit to THE STANDARD to start STD - I'll call you shortly." (Doc. 46-1 at 104 (Dep. Chandler at 250); Doc. 46-1 at 165).

- On **March 18, 2020,** Chandler texted Phares asking if his paperwork was sent to The Standard, adding it is not responding to his messages.  (Doc. 46-1 at 166).  Phares texted Chandler: " I WILL get you paid -- one way or the other with THE STANDARD!!" (Doc. 46-1 at 168).

- On **March 27, 2020,** Chandler texted Phares that at some point he needs his STD payments; in response, Phares instructed him to contact the Jackson hospital where he received treatment and have them fill out the forms and to call The Standard STD group who will send forms to the doctor's office.  (Doc. 46-1 at 169-170).

- On **April 7, 2020**, Chandler texted Phares that he had been on hold for 5 and 6 hours with The Standard over the past 2 days and cannot get any help, asking what else he can do, that he had no money left and cannot get his blood pressure medication.  (Doc. 46-1 at 171).

- On **April 8, 2020**, The Standard contacted Chandler's medical provider directly, who reported that they had not submitted medical documentation for Chandler's new STD claim because they were waiting until Chandler came in for an appointment and would not complete it until then. Chandler's medical provider faxed an APS later that day, indicating that Chandler was expected to return to work on June 1, 2020, after he was treated for alcoholism and got back on his bipolar medication. ( LP-02359-70). The provider attached Chandler's February 17th medical record. (Id. at LP-02361-2).

- On **April 16, 2020**, Chandler texted Phares that The Standard had received the doctors statements and were waiting on LP to finalize and on **April 17, 2020** Phares texted that she answered their email inquiry.  (Doc. 46-1 at 172).

- On **April 23, 2020**, Chandler texted Phares asking if he would be paid by April 24th and she stated that she believed so as his STD was approved.  (Doc. 46-1 at 172-173).

- On **April 21, 2020,** The Standard sent a letter to Chandler notifying him that it had approved his STD benefits noting he became disabled on February 18, 2020 and would receive benefits through March 9, 2020 and sent approval to LP for payment. (Doc. 46-1 at 148-155 (Def. Ex. 5)); Doc. 47-1 SEALED at 27-29 (LP-02375-02376, 02386); Doc. 46-2 (Decltn. Gipson-Vincent at ¶¶ 24, 27)). The Standard notified Chandler that it did not have enough information to approve his STD claim beyond March 9, 2020 and that it needed "office visit notes and the Mental Health Report[]" to extend benefits beyond that date. (Doc. 46-1 at 150).

Then, exasperated and without having received any STD benefits since he was last at LP in February 2020 and under financial duress, substantive texts were exchanged about Chandler's experience at LP.  Specifically, on **April 24, 2020**, Chandler texted Phares that "not paying me since February 28th ... wasn't what was agreed upon. This has bankrupted me now into debt I can never recover from. I'll be needing that back pay at some point."  (Doc. 46-1 at 173). Phares responded that his STD benefits began on February 18 and were approved through March 9th with a maximum STD benefit period through July 20, 2020, asking him to follow The Standard's instructions so there are no interruptions in benefits.  (Doc. 46-1 at 173). Chandler texted Phares that he had been "paid nothing" and Phares texted that LP followed all of the directions but that his medical team had not sent back the required medical documentation and The Standard will not pay without that; in response Chandler stated The Standard told him they have them forms, have had them, and he was approved. (Doc. 46-1 at 174). Phares texted she would call the Standard and see what is holding up his pay.  (Id.)  Chandler summed up his feelings:

> I came to work was sent home. Told to work on my health I'd be taken care of everything was going to be alright. I'd get 60 percent of the normal income. Instead I received nothing. Spent the last I had right after on doctor visits . All of my bills fell behind my new truck in repossession. And I can't afford basic medication for over a month now which I'd already stated. Zero income since February 28 no money for food and basics. I have done countless attempts to get the resolved. But I need my pay or unemployment. Because this this isn't help and in 15 years of experience I've never been down this far before.

***

I come to work that day even brought my food still have a locker. You sent me home told me to work on my health 90 days. Don't worry about a thing you will be on short term disability. Don't worry about bills just focus on your health and hugged me. I guess it wasn't enough to demote me cut my pay for speaking out against blatant racist ideology by Austin Green racism of which was dismissed although I seen it heard it. That wasn't enough you still dismissed me. He sent guys to cuss me out bully me. You give me your radio cause I had complained about having none same day it taken from me by a guy bullying me and I'm told I'm wrong sent home.

That was the first time I forgave that as well as your dismissal when every worker on that shift told me something I'd never asked but that Austin green told them I had threatened a mass shooting and bombing up there. I didn't ask them they were shocked to see me. But I was dismissed told I wasn't a fit your mill by you. I was trying to make something perfect that wasn't perfect. No I simply wanted to be treated like a human being.

Ive worked in mills since May 05 never been wrote up, much less retaliated against for speaking out against blatant racism. And unsafe working conditions. Of which I asked you to come see for yourself and was told I was wrong and to never do again. Funny thing being the chain of command you last one I had. Do you want to do God knows everything you said I said Austin Green said . What was done in the dark will be brought to the light.

(Doc. 46-1 at 176-178).

In response, the next day **April 25, 2020** Phares texted that Chandler was making "false accusations" and The Standard had approved his STD claim but still was waiting on Chandler's medical information from his medical team, asking him to devote his time and energy to talking

21

with them about sending in the required paperwork for his STD leave.   (Doc. 46-1 at 179).

Chandler responded:

> make flame block perfect. No I wasn't .
> I'd asked to stop being cussed out and
> threatened. You called Austin Green into
> your office when I told you I was covered
> under the Americans with disabilities
> act. Told me to tell him of which he told
> everyone. Based on my mental diagnosis
> alone and his hate for me being vocal
> about his racism. He told everyone that I
> had threatened a mass shooting. That's
> a fact of which you dismissed. A fact
> of which that whole crew told me that I
> didn't ask of them. So please spare me
> the hypocrisy and fake persona. It's vile
> and disgusting. Truth is you took the
> side of an white supremacy supervisor
> and refused to listen refused to stop
> retaliation, discrimination, blatant racism

> under the Americans with disabilities
> act. Told me to tell him of which he told
> everyone. Based on my mental diagnosis
> alone and his hate for me being vocal
> about his racism. He told everyone that I
> had threatened a mass shooting. That's
> a fact of which you dismissed. A fact
> of which that whole crew told me that I
> didn't ask of them. So please spare me
> the hypocrisy and fake persona. It's vile
> and disgusting. Truth is you took the
> side of an white supremacy supervisor
> and refused to listen refused to stop
> retaliation, discrimination, blatant racism
> of black worker's. My healthcare have
> sent the paperwork not that you care
> about me . I've told you before that I can't
> even afford basic blood pressure meds.
> So please stop the blame game of my
> medical workers. This is you .

(Doc. 46-1 at 180-181 (CL000263-264)).  Per Chandler, he complained about race discrimination

to Phares in these texts. (Doc. 46-1 at 104-109 (Dep. Chandler 250-255)).

On **April 27, 2020,** after Phares did some "digging around" she texted Chandler that once

the information goes to The Standard LP's HR is "kinda left out" but that The Standard approved

his leave 2/18-3/9 and LP corporate received the information from The Standard on 4/21 but benefits did not get the paperwork to payroll "until today" but that payroll processed it and he will receive a direct deposit in 24-28 hours after Tuesday, adding that he should be able to file for unemployment.  (Doc. 46-1 at 181-183 (Def's Ex. 3 texts (CL000265-266)). LP's pay records indicate that Chandler was paid on My 8, 2020 for 120.04 hours of STD benefits (Doc. 46-2 at 7 (Decltn. Gipson-Vincent at ¶27; Doc. 46-2 at 109 5/8/20 (pay stub)).

On **April 27, 2020** The Standard contacted Chandler's medical provider directly asking for office visit notes so that it could approve an extension of his leave. (LP-02409). The Standard received no response and Chandler did not follow up with The Standard to extend his leave. (Id.) The Standard never received additional documentation from Chandler's doctor to approve medical leave beyond March 9 and Chandler did not return to work. (Doc. 46-2 (Decltn. Gipson-Vincent at ¶20, Ex. C (LP 00066-74)); Doc. 53-3 at 7 (Dep. Phares at 353)).

At the **end of April 2020**, Phares told Chandler that he should be able to file for unemployment and so he filed for unemployment -- he did not know he could have filed for this before because he was waiting to receive his STD and thought he was still employed.  (Doc. 46-1 at 110 (Dep. Chandler at 258)).  Chandler was eventually approved for unemployment and he received the same until September 2020, when he secured a new position, as well as received extra COVID-10 relief money (extra $600/week).  (Doc. 46-1 at 111 (Dep. Chandler at 259)).

Chandler did not text Phares again about work until **June 20, 2020**, "are y'all hiring for water treatment processing[,]"on **June 24, 2020** "are things to slow at the mill," and on **July 11, 2020** "I just wanted to ask if I was going to be able to come back to work at the mill?" (Doc. 53-1 at 124; (Doc. 46-1 at 112-113 (Dep. Chandler at 260-261)). There is no indication in the record

that Phares responded. And while he did not know it on **July 11, 2020** when he texted Phares about being able to return to work, Chandler had been involuntarily terminated from LP effective **July 9, 2020**. (Doc. 46-2 (Decltn. Gipson-Vincent at ¶6)). Per Phares, Chandler was terminated because his "leave of absence was up. His short-term disability was never approved because medical documentation was not received. So he would be termed in the system." (Doc. 46-4 at 22 (Dep. Phares at 353)). Specifically, that as of **July 10, 2020** Chandler had not been at work for more than four (4) months and had not submitted the necessary paperwork to have his leave approved: he was not at work from February 15 onward and had not had his leave approved beyond March 9, so LP administratively terminated his employment on July 9, 2020. (Doc. 53-3 at 7 (Dep. Phares at 353)); Doc. 46-2 (Decltn. Gipson-Vincent at ¶6; Doc. 46-1 at 148 (Def's Ex. 5 (CL00074)) Chandler eventually received a termination letter from LP in the mail. (Doc. 53-1 at 52 (Dep. Chandler at 260-261)).

Following his termination, Chandler applied on-line for various positions at LP (Doc. 46-2). Specifically:

- On **September 5, 2020,** Chandler applied for a Forklift Operator position, and the position was closed and he was "not selected" as of October 14, 2020. (Id.; Doc. 46-1 at 156)).
- On **September 11, 2020,** Chandler applied for a Control Equipment Aid position and was "auto disqualified" effective that same day. (Doc. 46-2; Doc. 46-1 at 159).
- On **September 18, 2020,** Chandler applied for a FlameBlock Shipping Utility II position and was "auto-disqualified" and "not selected" as of October 16, 2020. (Id.; Doc. 46-1 at 156, 159 (Def's Ex. 11); Doc. 46-2 at 7 (Decltn. Gipson-Vincent); Doc. 46-2 at 111).
- On **September 19, 2020**, Chandler applied for a Utility II-E position and was "disqualified" as of September 22, 2020. (Doc. 46-2; Doc. 46-1 at 159)).
- On **September 23, 2020**, Chandler applied fora a Shipping Utility II position, and the position closed. (Doc. 46-2).
- On **September 25, 2020**, Chandler applied for Shift OSB Utility II-E position and the position was closed and he was "not selected" as of March 5, 2021. (Doc. 46-2; Doc. 46-1 at 158).
- On **October 5, 2020**, Chandler applied for a forklift operator position at LP and was auto-disqualified as of October 14, 2020. (Doc. 46-1 at 156).

Per LP, Phares did not know about Chandler's on-line applications because when the on-line application system "auto disqualifies" an application "it goes into a separate file" and HR is "not notified that the person is a qualified candidate." (Doc. 46-2 at 7 (Decltn. Gipson-Vincent at ¶28)). (Doc. 46-4 at 5-6 (Dep. Phares at 191-192)). Thus, per LP, neither the Clarke County facility nor Phares received notice of Chandler's "auto-disqualified" applications. (Id.) In contrast, Motes testified that outside applications submitted through the on-line portal for jobs open at the mill went through Phares. (Doc. 53-4 (Dep. Motes at 148)).[9]

On **October 24, 2020**, Chandler filed an EEOC Charge against LP alleging race and disability discrimination and retaliation from March 1, 2019[10] to October 1, 2020.  (Doc. 53-1 at 128-135). On **August 1, 2021** (amended August 2),  Chandler initiated this action against LP, alleging violations of the Civil Rights Act of 1966, 42 U.S.C. § 1981, as amended, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. & 42 U.S.C. § 1981a; and The Americans with Disabilities Act as amended, 42 U.S.C. § 12101, et seq. & 42 U.S.C. § 1981a. (Docs. 1, 2 (amended)).   Specifically, Chandler alleges ADA disparate treatment disability discrimination (Count I); ADA retaliation (Count II); ADA unlawful disclosure of confidential medical information (42 U.S.C. § 12112(d)); and Title VII/Section 1981 retaliation (Count IV). Generally, Chandler alleges that his termination from LP was discrimination based on his mental

---

9 Motes also testified that Phares was dishonest, unprofessional, violative of employee privacy, abused her position, circumvented his authority, "poison for the team[,]" "was very two-faced[,]" "either half honest or just totally dishonest[,]" and sabotaged things.  (Doc. 53-4 (Dep. Motes at 201-206, 221, 228-229, 232)).

10 LP's employment records indicate that Chandler's first day of employment was in August 2019.

25

disability and/or retaliation based on his complaints about disability and/or race discrimination. (Doc. 46-1 at 107-108 (Dep. Chandler at 253-254)).

## II. <u>Standard of Review</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Rule 56(c) provides as follows:

> *(c) Procedures*
>
> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).

The movant must demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the

evidence and the inferences from that evidence in the light most favorable to the nonmovant. Jean–Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. Id. Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); see also Fed. R. Civ. P. 56 Adv. Cmte. Note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials.... [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish -- with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. Celotex, 477 U.S. at 324. A genuine dispute exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. Waddell v. Valley Forge Dental Assoc., 276 F.3d 1275, 1279 (11th Cir. 2001).

III.   **Conclusions of Law: ADA Disparate Treatment Disability Discrimination (Count I)**

In Count I of his Amended Complaint, Chandler alleges he was subjected to ADA disparate treatment discrimination due to his disabilities because: 1) LP placed him on "forced" leave from December 2019-January 2020 and February-July 2020; 2) LP terminated his employment in July 2020; and 3) LP refused to rehire him for positions for which he applied and was qualified. (Doc. 2 at 17).

27

The *Americans with Disabilities Act*, 42 U.S.C. § 12101, *et seq.* ("ADA") provides "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA thus protects a qualified individual from discrimination on the basis of disability in the terms, conditions, and privileges of employment, and prohibits an employer from discriminating against a qualified individual with a disability because of the individual's disability. 42 U.S.C. § 12112(a); United States EEOC v. St. Joseph's Hosp., Inc., 842 F.3d 1333, 1343 (11th Cir. 2016); Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001). Absent direct evidence of disability discrimination -- but with some exception (*e.g.*, failure to make a reasonable accommodation under the ADA)[11] -- discrimination may be shown through circumstantial evidence under the McDonnell Douglas[12] burden shifting framework under which a plaintiff must first establish a *prima facie* case of discrimination. Dulaney v. Miami-Dade Cty., 481 Fed. Appx. 486, 489-490 (11th Cir. 2012); Palmer v. Albertson's LLC, 418 Fed. Appx. 885, 887 (11th Cir. 2011); Wascura v. City of South Miami, 257 F.3d 1238, 1242 (11th Cir. 2001). Or, via a convincing mosaic of circumstantial evidence. Jenkins v. Nell, 26 F.4th 1243, 1249-1250 (11th Cir. 2022).

Under McDonnell Douglas, "[t]o prevail under the ADA ... [a plaintiff] must prove all three elements of h[is] *prima facie* case by a preponderance of the evidence.[] "First, he must show that

---

11 The burden shifting analysis of Title VII is "partially applicable." Everett v. Grady Mem. Hosp. Corp., 2016 WL 9651268, *31 (N.D. Ga. May 12, 2016) (citing *Abram v. Fulton Cty. Govt.*, 598 Fed. Appx. 672, 676 (11th Cir. 2015); Nadler v. Harvey, 2007 WL 2404705, *9 (11th Cir. Aug. 24, 2007); Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1262 (11th Cir. 2007).

12 McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

he has a disability. []  Second, he must demonstrate that he is qualified  ... [to perform his job], with or without some reasonable accommodation by ... [the defendant], despite  ... his disability. Third, he must show that he has suffered an adverse employment action because of ... [his] disability (*i.e.,* that he has suffered employment discrimination)." <u>Doe v. Dekalb Cty. Sch. Dist.</u>, 145 F.3d 1441, 1445 (11th Cir. 1998) (footnotes omitted). <u>See also</u> <u>Thomas v. Cobb Cty. Sch. Dist.</u>, 2021 WL 5098767, *1 (11th Cir. Nov. 2, 2021) (a plaintiff must show that she was disabled, qualified, and was subjected to unlawful discrimination *because of her disability*).  If a plaintiff satisfies this initial hurdle, then the burden falls to the defendant employer to articulate a legitimate non-discriminatory reason for the challenged employment action -- which "must be clear and reasonably specific[]" -- via the introduction of admissible evidence.[13]  <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*). This is a "low bar." <u>Flowers v. Troup Ct., Ga., Sch. Dist.</u>, 8803 F.3d 1327, 1336 (11th Cir. 2015). If the defendant satisfies this burden, then the burden shifts back to the plaintiff, who must produce sufficient evidence for a reasonable factfinder to conclude that the reason was not the real reason for the adverse employment action, but was merely pretextual.  <u>Chapman, supra.</u> "[A] plaintiff must show that the defendants' proffered reason for the employment decision is false and that discrimination was the real reason." <u>Id</u>. (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993)).  A plaintiff cannot satisfy this burden

---

13 <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255-256, 258 (1981) (the employer must articulate legitimate non-discriminatory reasons which "must be clear and reasonably specific" via "the introduction of admissible evidence[]").  "The defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection."  <u>See generally</u> <u>Thompson v. DeKalb Cty.</u>, GA, 2021 WL 5356283 (11th Cir. 2021); <u>Willis v. Koch Agronomic Servs, Inc.</u>, 846 Fed. Appx. 787, 797 (11th Cir. 2021); <u>Duckworth v. Pilgrim's Pride Corp.</u>, 764 Fed. Appx. 850, 853 (11th Cir. 2019); <u>Chapman</u>, 229 F.3d at 1034-1035; <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1529-1530, 1538 (11th Cir. 1997); <u>Equal Employment Opportunity Comm'n v. Outokumpu Stainless USA, LLC</u>, 205 F.Supp.3d 1287, 1293 (S.D. Ala. Sept. 8, 2016).

"simply by disputing the wisdom of the reason or by substituting her business judgment for that of the employer's." (Id. (citing Chapman, 229 F.3d at 1030).  A plaintiff "must meet the employer's reason head on and rebut it."  Id.

Nevertheless, a plaintiff may still avoid summary judgment by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotations and citation omitted). "A convincing mosaic may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." Lewis, 934 F.3d at 1185 (internal quotations and citation omitted). However, a plaintiff's feelings or suspicions alone are insufficient to survive summary judgment. Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir. 1996) ("unsubstantiated assertions alone are not enough[]").

Turning to Chandler's *prima facie* case of ADA disability discrimination (disparate treatment), he must establish: 1) he has a disability; 2) he is a qualified individual (qualified to perform his job with or without some reasonable accommodation); and 3) he suffered an adverse employment action because of his disability (that he was subjected to unlawful disability discrimination). On summary judgment the parties agree Chandler is disabled because he suffers from Bipolar and Schizoaffective disorders and that he is a qualified individual; thus, the first two (2) elements of his *prima facie* case are satisfied. This leaves the third element -- whether Chandler

was subjected to unlawful discrimination because of his disability.  Bosarge v. Mobile Area Water & Sewer Serv., 2022 WL 203020, *6 (11th Cir. Jan. 24, 2022) (per curiam).

Chandler alleges that the following adverse employment actions were taken against him because of his disability): 1) LP placed him involuntarily on forced unpaid leave from December 2019 to January 2020 and February to July 2020; 2) LP terminated his employment in July 2020; and 3) LP refused to rehire him. (Doc. 2 at ¶94). LP argues that Chandler cannot establish that these actions were adverse employment decisions because: 1) his leave was not adverse as his doctors recommended leave, he requested leave, he received STD pay, and the leave was temporary; 2) his July 2020 termination was due to his extended absence from work without approved leave (he had been absent without approved leave for almost four (4) months) despite requests for additional information); and 3) his Fall 2020 failure to rehire was not disability related because an automated on-line system disqualified his application such that Phares and/or LP never received his application.

**First,** for the leave from December 2019-January 2020 and February 2020-July 2020), Chandler argues that because of his disability, he was involuntary placed on forced leave, which resulted in a loss in pay and other harm, and that during these periods he did not receive STD pay (only receiving same later) even though he was on STD leave. With regard to Chandler's December 2019-January 2020 leave, Chandler was placed on leave after reporting his ADA disability and workplace abuse to Phares, seeking a reasonable accommodation.  (Doc. 46-1 at 47-49, 67-69, 71, 108-109 (Dep. Chandler at 155-157, 178-180, 182, 254-255)). Chandler told Phares that while the bullying was impacting his ability to do his job, that he did not want to leave work and remained capable of performing his job -- he "just wanted workplace abuse to stop[.]" (Doc. 53-1 at 26 (Dep.

Chandler at 154-156); Doc. 52 at 7) Doc. 46-1 at 49 (Dep. Chandler at 157)). Chandler repeatedly testified that he did not want to leave his job even for a temporary period of time on short term disability, but just wanted the abuse to stop. Nevertheless, Supervisor Green summarily brought him paperwork "for me to sign it. We didn't really discuss anything."  (Doc. 46-1 at 45 (Dep. Chandler at 153)). The result was that "I was off work for a long time of not on my own accord or my own will[.]"  (Id. at 46 (Dep. Chandler at 154)). Chandler was "forced home."  (Doc. 46-1 (Dep. Chandler at 43, 212, 30, 16, 198, 202); Doc. 46-1 at 71, 85 (Dep. Chandler at 182, 202); Doc. 46-1 at 72 (Dep. Chandler at 183)).  Phares "told me that I had to go home and work on my health...on short-term disability[.]"  (Doc. 46-1 at 85 (Dep. Chandler at 202); Doc. 53-1 at 37 (Dep. Chandler at 198)).

In contrast, LP argues that Chandler told Phares that he needed to go on leave because he was having personal problems and that Phares told Chandler about his FMLA and disability leave options to protect his position at LP (Doc. 48 at 5) citing Doc. 46-4 (Dep. Phares at 315, 318, 322-323)).[14]  Specifically, Phares disputes Chandler's position that he did not ask for nor did he want medical leave by referencing what she does *generally* when an employee comes to her office -- but not what happened when Chandler came to her office:

---

14 LP also cites page 308 of Phares' deposition; however, it was not submitted on summary judgment.

32

```
            told you he did not want medical leave, you
            would challenge that?
                    A.      I don't understand.
                    Q.      Sure.  It says right here,
            plaintiff -- that's Chandler -- did not ask for
            and did not want medical leave.  So if
            Mr. Chandler were to testify under oath that he
            did actually not want to be put on leave, what
            would your response to that be?
                    A.      That's not true.
                    Q.      Your position would be what?
                    A.      That I would dispute that.
                    Q.      And that he wanted to be put on
            leave?
                    A.      When someone comes to my office to
            talk about a personal problem and they might
            need time off, yes, that's when we discuss that.
```

(Doc. 46-4 at 19 (Dep. Phares at 323)).  And LP's cited The Standard document, LP-02388, (Doc. 47-1 at 5) states nothing about Chandler requesting leave.

In other words, the evidence of record creates a genuine issue of material fact as to whether Chandler was involuntarily placed on forced leave based on his disability.  And placement of an employee on involuntary disability leave may constitute an adverse action. See, e.g., Timmons v. General Motors Corp., 469 F.3d 1122, 1128 (7th Cir. 2006) (finding that due to diminishment in the plaintiff employee's material responsibilities, "[p]lacing ....[him] involuntarily on disability leave was an adverse employment action[]"); Lanxon v. Crete Carrier Corp., 2001 WL 1589627 (D. Neb. Dec. 13, 2001) (finding a plaintiff established a prima facie case of discrimination related to forced medical leave amounting to an adverse employment action but also that the defendant articulated a legitimate, nondiscriminatory reason for delaying her return to work). Likewise, the EEOC's regulations to implement the ADA, 29 C.F.R. § 1630.2(l)(1), provide "an individual is

33

'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived .... mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity. Prohibited actions include ... placement on involuntary leave..."

Further, LP's assertion that Chandler's doctors recommended leave ("medical records establish that his medical providers said he could or should not work during these times[]" (LP-02356-023560) and so the leave was not adverse, is inaccurate. LP-02358, the only document cited by LP and which is related to Chandler's December 2019 leave, indicates that he was found to have <u>no limitations</u> or restrictions -- he was "able to function physically and mentally on medication." Additionally, while not cited by LP, Nurse Practitioner Brooks explained on December 17, 2019, that Chandler really did not even need to be off work at all: "there's really no clinical reason to hold him [off work] two weeks [through January 6, 2020]" indicating it was just to ensure he did not have a reaction. ((Doc. 53-6 (Dep. Brooks at 63)).

Concerning leave commencing in February 2020, per Chandler, Phares "came up with the idea that I had to go to treatment. And I thought I was obligated to do that to keep working there." (Doc. 46-1 at 87-90 (Dep. Chandler at 220-223)). To Chandler, he was "thinking that I could get back to work again[]" if he just went to treatment.  (Doc. 46-1 at 92 (Dep. Chandler at 225)).  "I did not ask for leave, I did not want leave, and I was capable of performing my job. And to be clear, I was not abusing alcohol."  (Doc. 53-1 at 133 (EEOC Charge)).  In contrast, per Phares, "[h]e told me he had an alcohol problem[]" and "needed to get some attention." (Doc. 53-3 at 6 (Dep. Phares at 314); Doc. 46-4 at 11 (Dep. Phares at 312)).  Also, Chandler's medical providers recommended leave for alcohol treatment, based on what Chandler reported to them: "[h]e states

[self-reported] he has a long history of drinking alcohol ... he binge drinks on the weekends... feels that he has nothing to look forward to other than drinking... he reports drinking 8-12 cans of 'twisted tea'... per day... has been to rehab in the past and it 'didn't work[]'")) (Doc. 47-1 SEALED at 14 (LP-02361)); he "present[ed] to clinic stating he is wanting to start medication to help him stop drinking (Doc. 47-1 SEALED at 14-15 (LP-02361-2362); "he is in agreement to go to therapy/detox/ or whatever option he has." (Id. at 14).

However, there still exists a factual dispute as to whether Chandler requested leave. If he did not request leave (during which he was belatedly paid 60% of his regular wages) and was unreasonably forced to take leave based on a perceived disability, a reasonable factfinder could find that Chandler ADA claim has merit.

**Second, whether the July 2020 termination is an adverse employment action because of his disability.** LP argues that Chandler's termination was not due to his disability but instead his extended absence from work without approved leave. However, the circumstances surrounding the July 2020 termination reveal issues of fact as to whether the termination was due to his disability or due to Chandler's failure to submit paperwork to get his short term disability extended.

**Third, whether the failure to rehire Chandler in the Fall 2020 is an adverse employment action due to his disability.** LP argues that LP's failure to rehire Chandler was not disability related because an automated on-line application system disqualified his application such that Phares and/or LP never received his application. A review of the evidence suggests otherwise -- at least for some of the Fall 2020 applications. And LP has not addressed their significance. Whether the failure to rehire Chandler in the Fall of 2020 was due to his disability is a question left to the jury.

35

Given the foregoing, LP has failed to discharge its initial summary judgment burden because it has failed to show the absence of genuine issues of material fact as to these issues, and thus the motion is **DENIED** as to Count I.

**IV.** **Conclusions of Law: Retaliation -- ADA (42 U.S.C. § 12101 et seq.) & Title VII/Section 1981 ( 42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 1981) -- (Counts II and IV)**

In Count II of his Amended Complaint concerning the ADA, Chandler alleges that LP forced him out of work for months, fired him, and then refused to rehire him, and that these actions constitute disparate treatment discrimination in violation for the ADA -- along with subjecting him to severe bullying and mistreatment, spreading malicious lies about him, and leaking his confidential medical information. On summary judgment Chandler alleges that he engaged in the following statutorily protected activity: 1) in **December 2019** when he requested a reasonable accommodation; 2) in **January 2020** when he complained to Phares about Green disclosing his confidential health information; and 3) in **April 2020** when he sent texts to Phares complaining about "ADA violations." (Doc. 2 at 17-19).

In Count IV of his Amended Complaint concerning Title VII/Section 1981, Chandler alleges that he engaged in statutorily protected activity: 1) when he opposed race discrimination in Greene's office in **August/September 2019** (Doc. 2 at 5-6); 2) when he reported race discrimination to Phares in **September 2019**; and 3) when he sent **April 2020** texts in which he "reiterated" concerns about racism. (Id. at 20-21). Chandler alleges that as retaliation, LP subjected him to materially adverse actions which would dissuade a reasonable employee from coming forward with complaints: severe bullying and related mistreatment; spreading malicious lies about

him; leaking his confidential medical information; forcing and/or keeping him on extended unpaid leave for many weeks; termination; and failure to hire and/or reinstate.  (Id.)[15]

As noted *supra*, Chandler asserts claims for retaliation under the ADA and Title VII/Section 1981.[16] "[C]ourts should evaluate ADA retaliation claims under the same framework used for Title VII retaliation claims[]"and "[r]etaliation claims are also cognizable under 42 U.S.C. § 1981 and are analyzed under the same framework as Title VII claims. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452–57... (2008); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)." Rice v. Guardian Asset Mgt. Inc., 2022 WL 1763816, *2 (11th Cir. Jun. 1, 2022) (per curiam); Gogel v. Kia Motors Manuf. of Ga., Inc., 967 F.3d 1121 (11th Cir. 2020).  See also Wilson v. Secretary of Veterans Affairs Dept. of Veterans Affairs, 2022 WL 1907863, *6-7 and

---

15 Chandler also alleged in his Amended Complaint retaliation by LP by "refusing to provide safety equipment and training and thus causing him physical and emotional injuries," "withholding workers' compensation information and benefits from him and causing him to pay medical expenses for an on-the-job injury," disrupting his "approved short term disability pay," and "demoting" him. However, on summary judgment Chandler has voluntarily withdrawn and/or abandoned these claims: "Chandler is no longer pursuing retaliation claims for "refusing to provide safety equipment and training and thus causing Chandler physical and emotional injuries . . . [or] withholding workers' compensation information and benefits from Chandler and causing him to pay medical expenses for an on-the-job injury." *See* doc. 2, at ¶¶ 101, 111." (Doc. 52 at 2 at note 1).  Additionally, on summary judgment Chandler has failed to address the alleged disruption of his "approved short term disability pay" and his alleged "demotion" -- which the Court thus deems as abandoned. Chandler also fails to address his claim that his January 2020 comment to Phares that his demotion out of Water Treatment was a result of his opposition to racism.  The law in this Circuit is clear: "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." Clark v. City of Atlanta, Ga., 544 Fed. Appx. 848, 855 (11th Cir. 2013) (quoting Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). See also Powell v. American Remediation & Envtl., Inc., 61 F. Supp. 3d 1244, 1252 n.9 (S.D. Ala. 2014) (while a court must ensure summary judgment is proper where party wholly fails to respond to motion, it may consider a particular claim abandoned where non-moving party fails to address that claim but does address others); Rossi v. Fulton Cty., Ga. 2013 WL 1213243, *13 (N.D. Ga. Feb. 13, 2013) (collecting cases)). Thus, these claims/issues are not before the Court on summary judgment.

16 "Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998), *abrogated on other grounds by* Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

note 3 (11th Cir. Jun. 3, 2022) (same); Stewart v. Jones Until. & Contracting Co., Inc., 806 Fed.

Appx. 738, 743 (11th Cir. 2020) ("[t]he ADA's anti-retaliation provision is similar to Title VII's,

and we assess ADA retaliation claims under the same framework. *Stewart v. Happy Herman's*

*Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997)[]").

     "Title VII prohibits private employers ... from retaliating against an employee because she

has opposed an act made unlawful by Title VII. *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d

1249, 1257–58 (11th Cir. 2012); 42 U.S.C. § 2000e–3(a). Section 1981 prohibits discriminating

on the basis of race during the course of a contractual relationship, such as one involving

employment, and likewise encompasses retaliation claims. *See CBOCS W., Inc. v. Humphries*, 553

U.S. 442, 446, 452 (2008)." Mohammed v. GHX Global Healthcare Exchange Inc., 2022 WL

1615925, *2 (11th Cir. May 23, 2022) (per curiam).  Likewise, [t]he ADA provides that '[n]o

person shall discriminate against any individual because such individual has opposed any act or

practice made unlawful by this chapter or because such individual made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under this

chapter.' 42 U.S.C. § 12203(a) ...." Rice, at *3. As summarized in Bosarge v. Mobile Area Water

& Sewer Service, 2022 WL 203020, *11 (11th Cir. Jan. 24, 2022):

> The ADA prohibits retaliation against an individual "because such individual has
> opposed any act or practice made unlawful [by the Act] or ... made a charge,
> testified, assisted, or participated in any manner in an investigation, proceeding, or
> hearing" under the Act. 42 U.S.C. § 12203(a).

See also Frazier-White v. Gee, 818 F.3d 1249, 1258 (11th Cir. 2016). Overall, "[t]o establish

opposition to an unlawful employment practice, the plaintiff must allege facts showing that he took

some action based on 'a good faith, reasonable belief that the employer was engaged in unlawful

employment practices.' *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010) (quotation

marks omitted). The practice opposed by the employee need not actually be unlawful as long as the employee subjectively believed it was unlawful and the 'belief was objectively reasonable in light of the facts and record present.' *Id.* (quotation marks and emphasis omitted)." Rancher v. Hubbell Power Sys., 2022 WL 1557047, *5 (N.D. Ala. May 17, 2022).

"Absent direct evidence that an employer has retaliated[]" Mohammed, 2022 WL 1615925 at *3 -- "[when a plaintiff] ... relies only on circumstantial evidence [--] we evaluate [his/]her retaliation claim under the *McDonnell Douglas* burden-shifting framework. *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000)* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792... (1973)*)." Ring v. Boca Ciega Yacht Club, Inc., 4 F.4th 1149, 1163 (11th Cir. 2021). The first step in this framework is for the plaintiff to establish a *prima facie* case of retaliation. Mohammed, 2022 WL 1615925 at *3.

To establish a claim for Title VII/Section 1981 or the ADA retaliation, a plaintiff must show: 1) he engaged in a statutorily protected conduct; 2) he suffered an adverse action; and 3) there was a causal link between the adverse action and his protected conduct. Rice, 2022 WL 1763816 at *3; *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260-1261 (11th Cir. 2001); *Burlington,* 548 U.S. at 68. Additionally, as summarized in Rice, *supra*:

> As for the "adverse action" element, "[a]n employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas,* 257 F.3d at 1261. In the context of Title VII, the Supreme Court has held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington,* 548 U.S. at 68 (quotations omitted).... adverse actions for retaliation claims are not limited to conduct that affects the terms, conditions, or privileges of employment. *Id.* at 61.
>
> For *prima facie* purposes, we've indicated that a plaintiff need only demonstrate "that the protected activity and the adverse action were not *wholly unrelated.*" *Shotz*

*v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003) (quotations omitted). Nevertheless, the alleged adverse action must "follow[ ] the protected conduct." *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999). Otherwise, it is impossible to prove "that 'the employer was actually aware of the protected expression at the time it took [the] adverse ... action.' " *Id.* (citation omitted).

Rice, 2022 WL 1763816 at \*3. And protected conduct (*i.e.*, making or supporting a report of discrimination) "is actionable whether or not the mistreatment rises to the level of a tangible employment action, but only if the mistreatment 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Monaghan v. Worldpay US, Inc., 955 F.3d 861 (11th Cir. 2020) (quotation and citations omitted).

Moreover, "[t]o prove causation for purposes of making out a *prima facie* case of retaliation, a plaintiff must first show that 'the decision-maker[s] [were] aware of the protected conduct' and then establish that the protected activity and the adverse action 'were not wholly unrelated.' *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (alterations in original) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)). The plaintiff must, at minimum, generally establish that the employer was actually aware of the protected expression at the time [it] took the adverse action.' *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997)." Mohammed, 2022 WL 1615925 at \*3.

Further,

Once the *prima facie* case is established, it creates a "presumption that the adverse action was the product of an intent to retaliate." *Bryant*, 575 F.3d at 1308. The burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action. *Id.* If the employer produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the "proffered reason was merely a pretext to mask [retaliatory] actions." *Id.* To establish the necessary causation, a plaintiff must demonstrate that "her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338...3

(2013). In other words, "a plaintiff must prove that had she not [engaged in the protected conduct], she would not have been fired." *Jefferson*, 891 F.3d at 924. "... throughout this entire process, the ultimate burden of persuasion remains on the employee." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013).

Gogel, 967 F.3d at 1135. "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." Ring, 4 F.4th at 1163 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). "[A] plaintiff's failure to rebut even one nondiscriminatory reason is sufficient to warrant summary judgment[.]" Id. (citing Smelter, 904 F.3d at 1290-1291).

**A.    Title VII/Section 1981 Race Discrimination Retaliation (Counts II and IV)**

Chandler alleges that he was retaliated against for opposing[17] race discrimination at LP. On summary judgment, LP argues that Chandler's retaliation claim fails because he did not engage in statutorily protected activity under Title VII/Section 1981 because the dates on which he alleges that he made race discrimination complaints to LP, he did not, instead complaining of non-racial matters.

To survive summary judgment, Chandler must show that: 1) he engaged in a statutorily protected conduct; 2) he suffered an adverse action; and 3) there was a causal link between the adverse action and his protected conduct. First, while Chandler did not specifically name the interaction with Supervisor Green -- telling him not to use racist terms around him in

---

[17]"[A] plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Little v. United Technologies, Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997) (citing Rollins v. State of Fla. Dept. of Law Enforcement, 868 F.2d 397, 400 (11th Cir.1989)). "[A] plaintiff's burden under this standard has both a subjective and an objective component" and "[a] plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented." Id.

**August/September 2019** -- as statutorily protected activity in his Amended Complaint to, he did make these allegations in the Amended Complaint:

> ... August 2019... Plaintiff walked into Flame Block Supervisor Austin Green's office ...
>
> Green was in the middle of a conversation with Stevie Overton, an openly racist Caucasian maintenance employee who also worked in Flame Block. Green said, in Plaintiff's presence, that "African-Americans" are (1) "demons"' (2) "only good as servants"' and (3) "good for laughing at." Overton agreed.
>
> Plaintiff asked Green to stop speaking with racist language in his presence. Green and Overton were both visibly displeased with Plaintiff's request.

(Doc. 2 at 5-6). As such, the Court does not construe Chandler's summary judgment contentions regarding the interaction with Supervisor Green -- as the first protected activity -- as improperly amending the complaint on summary judgment as LP suggests. Additionally, Chandler's opposition to Supervisor Green's racial remarks, made directly to him and in the presence of Overton, is protected activity.  And Chandler alleges that as a result of his opposition to Supervisor Green's racism that day, which he subsequently reported, he was eventually bullied at work, and placed involuntarily on leave.  LP does little to address this on summary judgment.

Second, concerning the **September 2019** communication (about one week later), LP argues that Chandler's report to Phares at that time was solely about Supervisor Lewis, and contained no complaints about race discrimination.  (Doc. 48 at 22-23 (citing Page 344 of Chandler's deposition)). The evidence indicates that this assertion is disputed.  According to Chandler, this is when Chandler reported race discrimination (about Supervisor Green) to Phares for the first time. (Doc. 46-1 at 134 (Dep. Chandler at 345)).  Phares "didn't want to hear about it[]" and "did not ask any questions or do any investigation." (Doc. 46-1 at 119-120 (Dep. Chandler at 287, 289)).  Phares did not believe he was telling the truth or that any racism was occurring, stating Green was

not "like that."   (Id.)  Chandler testified as well, as to what he reported to Phares as contained in

his EEOC Charge:

> I went to Sundy Phares in HR and reported that there was race discrimination
> occurring in the plant. She didn't want to hear about it. Ms. Phares did not ask any
> questions or do any investigation. In fact, Phares tried to hurry me out of the office.
> But I wanted to give her an example so I told Ms. Phares about Brian Williams
> (African- American). Mr. Williams was a great worker. I personally witnessed
> Green fire Williams for a bogus reason only to replace him with an unqualified
> white kid barely out of high school. I was present for the purported "problem" that
> Green used as a pretext to fire Williams, which was in no way Williams' fault or
> responsibility. I observed Green do something very similar with my African-
> American co-worker Charles, who Green literally set up (I have personal
> knowledge of this) for termination only to replace him with a white kid, again
> barely out of high school. Racial discrimination at LPC was pervasive, and it was
> reflected not only by Green's comments about "black demons," but also in racist
> hiring and disciplinary practices. Put simply, whites received way better treatment
> than African-Americans. But Phares did not appear to care about racism at LPC.

(Doc. 53-1 at 55 (Dep. Chandler at 270-271 (Ex. 6, CL00023-24); Doc. 53-1 at 132 (EEOC

Charge)).

Chandler engaged in a protected conduct in reporting the racism to Phares.  And the

evidence indicates, considered in a light most favorable to Chandler, that on the heels of this report,

Chandler's work environment became "intolerable" and "drastically changed."   Caucasian

employees Stevie Overton (Overton - who had been present in the office with Green when

Chandler heard the racist remarks and opposed same)and Brent Newton (Newton), began bullying

and "dehumaniz[ing]" him -- "cussing" him out and "routinely accosted, threatened, demeaned,

and targeted" him thereafter -- and for months.  (Doc. 53-1 at 18, 26-33 (Dep. Chandler at 125,

156-157, 159, 161-163, 166-169, 173-175, 179-182)); Doc. 46-1 at 65, 67-68 (Dep. Chandler at

174, 178-179).  Chandler testified that Overton started bullying him after Chandler told Overton

and Green that he did not believe "in the racist ideology and culture and stuff." (Doc. 46-1 at 61

(Dep. Chandler at 169)).  That bullying and treatment ultimately resulted in Chandler reporting to Phares, in December 2019, about the workplace abuse and his ADA protected disabilities.  The same day he reported the workplace abuse to Phares (which Chandler believed was the result of his opposition to Supervisor Green's racism at work), he was involuntarily placed on leave. Chandler's evidence, if accepted by a factfinder as true, suggests a causal link between an arguably adverse action and his protected conduct.

Third, for the **March 11, 2020-April 27, 2020** text communications (which Chandler does address albeit summarily (Doc. 52 at 24)), the evidence indicates that Chandler sent/received texts to Phares in which he stated, in part, that he had previously complained about racism: "I guess it wasn't enough to demote me [and] cut my pay for speaking out against blatant racist ideology by Austin Green."  See *supra*.  Chandler is thus referencing his prior report about Supervisor Green to Phares in September 2019 -- his prior report of race discrimination to Phares.

Given the foregoing, LP has failed to discharge its initial summary judgment burden because it has failed to show the absence of genuine issues of material fact as to these issues, and thus the motion as to Chandler's Title VII/Section 1981 retaliation claim is **DENIED**.

**B.    ADA Retaliation**

To establish ADA retaliation, Chandler must show: 1) he engaged in statutorily protected conduct; 2) he suffered an adverse action; and 3) there was a causal link between the adverse action and his protected conduct.  In his Amended Complaint, Chandler alleges ADA retaliation based on: 1) his **December 2019** request to Phares for a reasonable accommodation due to his disability; 2) his complaint in **January 2, 2020** when he allegedly complained to Phares about Green disclosing confidential health information; and 3) his **April 2020** texts to Phares complaining about

"ADA violations." (Doc. 2). On summary judgment LP agrees Chandler's December 2019 request for a reasonable accommodation was protected activity.  However, LP contends that Chandler's *prima facie* retaliation case related to the ADA fails because his January 2020 and April 2020 reports were not statutorily protected activity

First, the parties agree that Chandler made a request for a reasonable accommodation in **December 2019**, which is statutorily protected activity under the ADA.  That is when Chandler first notified supervisor Phares that he was biploar and had been diagnosed with schizoaffective disorder.  (Doc.  (Dep. Chandler at 155-15, 160-161, 7); CL00025 Ex. 6 thereto).  Per Chandler, Supervisor Green told Supervisor Lewis he was being fired at that time. (Doc. 46-1 (Dep. Chandler at 348-349)).  And Chandler argues that he was immediately, that same day, placed on "forced leave" in retaliation for same supporting a causal connection. As noted *supra*, these facts, in the light most favorable to Chandler, support a *prima facie* case of ADA retaliation.

Second, the **January 2, 2020** text from Chandler to Phares was about his mother-in-law and brother-in-law learning of his medical diagnosis  (Doc. 46-1 (Dep. Chandler at 231); Doc. 53-1 at 101-102 (CL000244-245).  Additionally, Chandler reported to Phares that the fact that his medical diagnosis had gotten out was "a big" HIPAA violation. (Doc. 53-1 at 101-102).  Chandler argues that this text was a report about Supervisor Green, as Chandler believes he told everyone about his disabilities. The Court does not find that this text standing alone is protected activity, rather it was rank speculation as to how his family learned of his medical diagnosis.

Third, the **April 2020** texts from Chandler "reiterated concerns" to Phares about receiving STD disability pay. (Doc. 53-1 at 112-130) (CL000255-264)). Per LP, however, other than mentioning that he was covered by the ADA, the texts do not mention his disability or disability

discrimination but instead contain a rant about Supervisor Green and statements that he was a racist.  This is not accurate.  The texts reveal Chandler's continued frustration in having his STD leave, based on his ADA covered disability, unpaid.  Additionally, Chandler specifies that he "was sent home" to 'work on my health" but he has receiving nothing, and he believed he was demoted and his pay was cut for "speaking out against blatant racist ideology" by Supervisor Green "which was dismissed although I seen it heard it. ...you still dismissed me. He sent guys to cuss me out bully me..." (Id. at 115).  In other words, for Chandler, it was all connected and he was being retaliated against -- still -- based on opposing race discrimination at work. For Chandler, this was a continuum and a reasonable jury could find likewise.

Given the foregoing, LP has failed to discharge its initial summary judgment burden because it has failed to show the absence of genuine issues of material fact as to these issues, and thus the motion as to Chandler's ADA retaliation claim is **DENIED**.

## V.   Unlawful disclosure of confidential medical information (42 U.S.C. § 12112(d)) (Count III)

In his Amended Complaint, Chandler alleges that LP disclosed his confidential medical information in violation of 42 U.S.C. § 12112(d).  (Doc. 2 at 19-20 -- Count III).  As alleged:

Chandler had the following disabilities (mental impairments that substantially limit major life activities) ... Bi-polar 1 and Schizoaffective Disorder. As of December 2019, LP regarded Chandler as having these disabilities. And LP had records of Chandler's impairment prior to his discharge.

Chandler and Phares, along with Austin Green, had a conversation in December 2019 during which Chandler discussed his confidential medical information (i.e., his disabilities), and Phares made performance-related inquiries regarding the same.

Austin Green disclosed Chandler's confidential medical information in violation of 42 U.S.C. § 12112(d).

46

Chandler suffered tangible injury as a result of this unlawful disclosure. Specifically, Chandler lost his home and many of his personal possessions when his in-laws learned of his medical condition.

(Id.) On summary judgment, Chandler cites Section 12112(d)(4)(c) and argues:

... in early December 2019... Chandler told Phares he was bipolar and had been diagnosed with schizoaffective disorder, and that he had rights under the ADA. (Chandler Dep. 155:8-157:18)...

*** 

... Chandler recalled Phares being the first to disclose his mental health conditions to Austin Green; to that end, Chandler testified:

> Q. So, when Mr. Green comes in, how does that conversation start again? Do you start it, does –
> A. She starts it, like, Skyler's having some problems with Stevie. You know he has a history of cussing at people and stuff. But I told her that I didn't want confrontation, like, to be physical or anything because I'm not a violent person. But I didn't -- I just didn't want him coming back there, you know. I'm by myself back there. **And she told Austin that** -- basically, what I told her, that I had had issues with him and the maintenance coming back there and t**hat I was diagnosed as a bipolar and schizoaffective disorder**.

... Green then disclosed Chandler's mental health disabilities to workers at the Clarke County mill and falsely accused Chandler of threatening to commit a mass shooting at the mill. (Chandler 253:11-17, 257:15-20. No one knew Chandler's medical condition except for Chandler's wife and his medical providers. (Chandler Dep. 193:4-5). Soon, it appeared that everyone knew it, including Chandler's in-laws, who became scared of Chandler and kicked him and his family out of the home he was living it, devastating Chandler's physical and financial security along with the health of his marriage. (Chandler Dep. 31:5-17, 211:21-22). Kelvin Lewis testified that Austin Green disclosed Chandler's mental health conditions to him, and Mr. Lewis reprimanded Green for committing a "HIPPA violation." (Lewis Dep. 318:12-319:16, see also Chandler Dep. 233:18-234:4)....Chandler further testified that "Jessie" also told him Green disclosed Chandler's confidential medical information. (Chandler Dep. 191:7-18)...

*** 

... After meeting with Phares and Chandler, Green spread a lie that Chandler threatened to shoot the plant up ...

*** 

...LP[C] misconstrues the record in concluding that Chandler's disclosure to Green was voluntary; it was not, as Phares first disclosed Chandler's disability to Green in Chandler's presence ... Regardless, voluntary, job-related disclosures (*i.e.*

> seeking workplace accommodations), are still covered by the confidentiality requirement set out in 12112(d)(4)(c), which applies to information gathered from lawful inquiries made into the ability of an employee to perform job-related functions. And that is the case here, where Chandler disclosed his disability to Phares, and subsequently Green, in December 2019 in conjunction with his ADA workplace accommodation request for a position transfer. LP did not keep Chandler's confidence, and his mental health diagnoses were leaked immediately to members of the mill (including Lewis, Jaimee, and everyone Chandler worked with) along with the notion that Chandler was now dangerous. Chandler was humiliated, ostracized, and literally kicked out of his home as a result. He is entitled to a jury trial on this claim.

(Doc. 52 at 8-9, 19-21). (Doc. 46-1 at Chandler Dep. 160-161). On summary judgment, Chandler relies on his deposition and the deposition of Supervisor Lewis. (Doc. 53-1 (Dep. Chandler at 31,[18] 155-157, 160-161, 191, 193, 211, 253, 257) and Doc. 53-2 (Dep. Lewis at 318-319)).

LP moves for summary judgment on Chandler's claim, contending that Section 12112(d) does not govern voluntary disclosures initiated by an employee, which is what it argues that Chandler did. Cash v. Smith, 231 F.3d 1301, 1307-1308 (11th Cir. 2000).  In its reply, LP adds that: 1) Chandler "wanted to give [Phares] my mental health diagnoses, and I did[]" (Doc. 46-1 at 49 (Dep. Phares at 157)); 2) Phares' disclosure of Chandler's medical information to his supervisor Green, and Green's disclosure to another supervisor Lewis, is permissible per Cash v. Smith, 231 F.3d 1301, 1307-1308 (11th Cir. 2000); and 3) Chandler has submitted no evidence that LP disclosed his medical condition to his in-laws.

Generally speaking, Section 12112(d) applies to medical inquiries of an employer to an employee and concerns situations in which an employer may require an employee to submit to such inquiry.  "The Act ... restricts an employer's ability to make medical ... inquiries that relate to an applicant's disability status ... § 12112(d). Subsection 12112(d)(1) states the general bar against

---

[18] While cited, Chandler did not submit Page 31 of his deposition and so it is not before the Court.

using medical ... inquiries to discriminate. Subsections (d)(2) through (d)(4) provide ... guidance regarding three distinct phases of the application process: (1) pre-offer... § 12112(d)(2); (2) post-offer but pre-employment ... § 12112(d)(3); and (3) employment ... § 12112(d)(4)." Harrison v. Benchmark Elec. Huntsville, Inc., 593 F.3d 1206, 1212 (11th Cir. 2010). See also Scoggins v. Floyd Healthcare Mgt. Inc., 2016 WL 11544774, *27-28 (N.D. Ga. Jun. 10, 2016) (same). However, "[n]otwithstanding the proscriptions in § 12112(d)(4)(A), an employer may "make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B)." Russell v. City of Mobile Police Dept., 552 Fed. Appx. 905, 906 (11th Cir. 2014). Moreover, "[s]upervisors and managers may be informed regarding necessary restrictions on the work or  duties of the employee and necessary accommodations. 42 U.S.C. § 12112(d)(3)(B)(i), (d)(4)(C) (2008)." Gilliard v. Georgia Dept. of Corr., 500 Fed. Appx. 860, 872 (11th Cir. 2012).  Further, "when an employee voluntarily discloses information to the employer ... the employee cannot establish an unlawful disclosure under the ADA. *Cash,* 231 F.3d at 1307–08." Id. at 872. See also Grimsley v. Marshalls of MA, Inc., 284 Fed. Appx. 604, 610 (11th Cir. 2008) ("when an employee voluntarily discloses this information to the employer rather than provides it to the employer in response to a permissible inquiry or examination, the employee cannot establish an unlawful disclosure under the ADA[]" (citing Cash, *supra*)). Finally, to succeed on a Section 12112(d)(4)(A) claim, the plaintiff-employee must show damages -- "emotional, pecuniary, or otherwise." Gilliard, 500 Fed. Appx. at 907 (citing Harrison v. Benchmark Elecs. Huntsville, Inc.*,* 593 F.3d 1206, 1216–17 (11th Cir.2010) to hold that "we agree with the district court that the proof of damages requirement set in *Harrison* equally applies to cases involving allegedly improper inquiries under § 12112(d)(4)(A)[]"")).

With this in mind, the Court turns to Chandler's unlawful disclosure claim. As a point of clarification, this case does not concern an alleged pre-offer or post-offer but pre-employment disclosure, but a post-employment disclosure as Chandler was employed. Thus, the Court's review of Section 12112(d) is limited to Section 12112(d)(4) -- disclosures made while employed, and to Section 12112(d)(4)(C) cited by Chandler (to the extent related to the Section 12112(d)(4) claim). Scoggins, 2016 WL 11544774 at *28. Section 12112 provides, in relevant part:

> **(a) General rule**
> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.
> \*\*\*
> **(d) Medical examinations and inquiries**
> > **(1) In general**
> > The prohibition against discrimination as referred to in subsection (a) shall include medical examinations and inquiries.
> > \*\*\*
> > **(3) Employment entrance examination**
> > > \*\*\*
> > > **(B)** information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that--
> > > > **(i)** supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;
> > > > \*\*\*
> > > **(C)** the results of such examination are used only in accordance with this subchapter.
> >
> > **(4) Examination and inquiry**
> > > **(A) Prohibited examinations and inquiries**
> > > A covered entity ...shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or

> inquiry is shown to be job-related and consistent with business
> necessity.
> **(B) Acceptable examinations and inquiries**
> .... A covered entity may make inquiries into the ability of an
> employee to perform job-related functions.
> **(C) Requirement**
> Information obtained under subparagraph (B) regarding the medical
> condition or history of any employee are subject to the requirements
> of subparagraphs (B) and (C) of paragraph (3).

This means that allegations of "unlawful disclosure" are subject to Section 12112(d)(3)(B) and

allegations of "prohibited" (and acceptable) "inquiries" are subject to Section 12112(d)(4) (and

how such may result in an unlawful disclosure under Section 12112(d)(3)(B) and (C)).

As summarized in Mullin v. Secretary, U.S. Dept. of Veterans Affairs, 2022 WL 2159721,

*14 (M.D. Fla. Jun. 15, 2002):

> ... 42 U.S.C. §§ 12112(d)(4) and 29 C.F.R. § 1630.14(c)(1) ...
>
> Under those statutes, employers may not "make inquiries of an employee as to
> whether such employee is an individual with a disability or as to the nature or
> severity of the disability, unless such ... inquiry is shown to be job-related and
> consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). While employers
> may "make inquiries into the ability of an employee to perform job-related
> functions," any health information received via such inquiry must be collected and
> maintained on separate forms and in separate medical files and must be treated as
> a confidential medical record. Id. §§ 12112(d)(4)(B), (C); 29 C.F.R. § 1630.14(c);
> see also Cripe v. Mineta,... 2006 WL 1805728, at *5 (D.D.C. June 29, 2006)
> (explaining that the Rehabilitation Act incorporates the confidentiality provisions
> of the ADA).

At the outset, Section 12112(d) only applies if LP, as the employer, made a disability

related inquiry of Chandler.  First, Chandler alleges a Section 12112(d)(4)(C) regarding an inquiry

that was not kept confidential, with regard to Phares.  As to what constitutes an "inquiry" from an

employer, "a 'disability-related inquiry' is a 'question (or series of questions) that is likely to elicit

information about a disability.' EEOC's Enforcement Guidance, 2000 WL 33407181 at *3.

According to the EEOC, disability-related inquiries may include the following: asking an employee whether s/he has (or ever had) a disability or how s/he became disabled or inquiring about the nature or severity of an employee's disability; asking an employee to provide medical documentation regarding his/her disability; asking an employee's co-worker, family member, doctor, or another person about an employee's disability; asking about an employee's genetic information; asking about an employee's prior workers' compensation history; asking an employee whether s/he currently is taking any prescription drugs or medications, whether s/he has taken any such drugs or medications in the past, or monitoring an employee's taking of such drugs or medications; and, asking an employee a broad question about his/her impairments that is likely to elicit information about a disability (e.g., What impairments do you have?). Id. (footnotes omitted)." Scoggins, 2016 WL 11544774 at *29.

Stated simply, the record reveals that there was no initial inquiry from LP. Instead, Chandler *voluntarily* disclosed his medical information to Phares in December 2019: "I told Sundy Phares that I wanted her to know that I was covered under the Americans With Disabilities Act, that I wanted to give her my mental health diagnosis, and I did[]" -- "I told her that I am a diagnosed bipolar with schizoaffective disorder." (Doc. 53-1 at 26 (Dep. Chandler at 155-157). As such, Section 12112(d) is simply not triggered with regard to *that* disclosure as it applies to "[a] covered entity [employer] .... [that] make[s] inquires of an employee[,]" not an employee's voluntary disclosure of medical information to an employer.

Second, Chandler alleges that Phares "made him" disclose his medical information to Supervisor Green.  Chandler cites to his testimony stating that after he told Phares about his medical condition in December 2019 and he requested accommodation, "[s]he said... we needed

to call Austin Green into the office and that I had to tell him my diagnosis." (Doc. 53-1 at 26 (Dep. Chandler at 157). However, Chandler also testified that "*she* [not Chandler] told Austin [Green] that -- that I was diagnosed as a bipolar and schizoaffective disorder[.]" (Doc. 53-1 27 (Dep. Chandler at 160-61)). Again, this is not an inquiry. This would be Supervisor Phares disclosing Chandler's *volunteered* medical information to Supervisor Green in Chandler's presence. And even if such could be construed as an inquiry, supervisor to supervisor disclosure of medical information of an employee is permissible, as such information assists employers to provide reasonable accommodations for an employee if and when needed. Gilliard v. Georgia Dept. of Corr., 500 Fed. Appx. 860, 872 (11th Cir. 2012) ("Supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations. 42 U.S.C. § 12112(d)(3)(B)(i), (d)(4)(C) (2008)[]"); Floyd v. SunTrust Banks, Inc., 878 F.Supp.2d 1316, 1324 (N.D. Ga. 2012) (Congress' purpose in enacting the ADA, was at least in part, "to permit employers to inquire into employees' medical conditions in order to provide reasonable accommodations[]"). And Section 12112(d)(3)(B) -- cited by Chandler -- specifically states that "information obtained regarding the medical condition or history of the applicant .... is treated as a confidential medical record, *except that[]...supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations*[.]" 42 U.S.C. § 12112(d)(3)(B)(i) (emphasis added).

Third, Chandler alleges that Supervisor Green's disclosure of that information to Supervisor Lewis was unlawful under Section 12112(d)(4), based on Doc. 53-2 at 6-7 (Dep. Lewis at 318-319). Supervisor Lewis testified as follows:

...And he says to me, he's like: Hey, you heard about Skyler? I said: No. What happened? He said: Oh, man, he threatened to come back and he got mad with

Sundy about something, he didn't say what it was, but he was upset with Sundy and upset with FlameBlock. And he said he's going to come back and shoot the mill up and shoot people up in the mill. I said: No. I said: That doesn't sound like him. He's a real quiet guy. He keeps his own company. I said: The bill just didn't fit. He said: Oh, yeah. He said: Sundy told me that he was taking all these different medications for schizophrenia and dementia. And now me having studied medical, I said: Wait. He said: What? I said: Sundy told you that? He said: Yeah, she told me. I said: Well, she's in violation of HIPAA if she told you that. And he was like: Well, I'm just going from what she told me. And it wasn't an hour later, you know, I'm walking through the mill doing checks, I got people stopping me asking: Hey, I heard that Skyler guy going to come back and shoot the mill up. What's going on, what's going on? ...

(Id.) Again, this is not an inquiry. And even if such could be construed as an inquiry, Supervisor Green's disclosure to Supervisor Lewis was not unlawful under Section 12112(d)(4) as it was *between supervisors*.  See *supra*.

Fourth, Chandler asserts that LP "did not keep" his confidence and instead "leaked [his medical condition] immediately to members of the mill (including Lewis, Jaimee, and everyone Chandler worked with) along with the notion that Chandler was now dangerous[]" Chandler was humiliated[] [and] ostracized[.]" As alleged in the Complaint, Chandler argues that supervisor Green is the "leak" and further, he testified as follows:

A.  ...they told me that Austin Green had told everybody my mental condition and also added the extra that I had threatened a mass shooting of the place....

Q. And who were those workers who told you that Austin had told everyone about your mental condition and that you had threatened a mass shooting?

A. Several. I mean, I didn't know everybody's name out there. It's a big mill, you know. The only one that I recall as a first name would be Jessie ...

\*\*\*

.... And to know that anybody and everybody knows what I've hid my whole life -- ... I had only told my wife that, my medical workers that. And everybody knew now that I was schizophrenic or -- and it was hard to deal with. It's scary.

... it scared me to know that people looked at me, much less would put me in a category as a murderer. .... I had never discussed my mental condition with anybody

54

> other than my medical workers and my dad and my mom, my brother ... And it was
> a bad time for me.
>
>           \*\*\*
>
> ... Austin Green told them I was threatening a mass shooting and bombing up
> there...

Doc. 53-1 at 35, 50-51 (Dep. Chandler at 191, 193, 253, 257)). Also, Supervisor Lewis testified

*supra* that "it wasn't an hour" after Supervisor Green told him about Chandler's medical condition

that he was walking through the mill and was asked about him shooting the mill up (though nothing

was asked about his medical information or condition). (Doc. 53-2 (Dep. Lewis at 318-319)).

At the outset, again, this is not an inquiry scenario.  And even if such could be construed

as an inquiry, Chandler's cited materials are not evidentiary support for his contentions.  Instead,

it is conjecture and speculation.  Chandler has not submitted sufficient evidence to the Court

establishing a genuine issue of material fact that Supervisor Green "leaked" his medical

information in violation of Section 12112(d)(3)(B). Thus, Chandler has submitted insufficient

evidence to support this "leaked" assertion and/or to create a genuine is issue of material fact.

Chandler also cites no relevant evidentiary support with regard to his in-laws learning about

his medical information from LP (or Supervisor Green) and/or that another employee "Jessie" was

told by LP (or Supervisor Green) about said information.  The deposition pages cited by Chandler

mention nothing about these allegations. And again, Chandler's allegations are rooted in conjecture

and speculation and fail to create a genuine issue of material fact.

Nevertheless, even assuming *arguendo* for purposes of summary judgment that LP made

an inquiry of Chandler that would fall under Section 12112(d)(4), there is no evidence establishing

that such inquiry was anything other than job-related and consistent with business necessity. As

summarized in Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306, 1311-1312 (11th Cir. 2013)

(footnotes omitted):

> The phrase "job-related and consistent with business necessity" appears not only in § 12112(d)(4)(A) of the ADA, but in §§ 12112(b)(6), 12113(a), and 12113(c) ..."job-relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer" as a basis for an employment decision, while "[b]usiness necessity, in context, is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria" for such a decision. *See Allmond v. Akal Sec., Inc.,* 558 F.3d 1312, 1317 (11th Cir.2009) (interpreting language in § 12113(a)) (internal quotation marks and alterations omitted). Because "[a] term appearing in several places in a statutory text is generally read the same way each time it appears," *Ratzlaf v. United States,* 510 U.S. 135, 143... (1994), we use the *Allmond* definitions here.
>
> ***
>
> The evaluation was "job-related" because an "employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position." *Williams,* 303 F.3d at 1290.
>
> ***
>
> ...*See, e.g.,Krocka v. City of Chicago,* 203 F.3d 507, 515 (7th Cir.2000) ("We have stated that where inquiries into the psychiatric health of an employee are job related and reflect a concern with the safety of employees, the employer may ... require that the employee undergo a physical examination designed to determine his ability to work."); *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 812 (6th Cir.1999) ("[W]e note that the district's obtaining advice that further examination was needed to determine Sullivan's fitness to work buttresses the district's claim that it had reason to believe Sullivan could not perform some essential aspects of his job.").[1]
>
> For basically the same reasons, the evaluation was also "consistent with business necessity." ... *See Conroy,* 333 F.3d at 97 ("[B]usiness necessities may include ensuring that the workplace is safe and secure."). *See also E.E.O.C. v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276, 1283 (7th Cir.1995) ( "It would seem that a requirement that employees not pose a significant safety threat in the workplace would obviously be consistent with business necessity: a safe workplace is a paradigmatic necessity of operating a business."); *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1119 (11th Cir.1993) (holding that protecting employees from workplace hazards is a "business necessity" under Title VII).

Chandler has made no effort to cite the Court to evidence which establishes otherwise, or creates a genuine issue of material fact regarding the nature of any such inquiry.

56

Upon consideration, Chandler has failed to establish a genuine issue of material fact on this claim and LP's motion for summary judgment on Count III is **GRANTED.**

**VI.**   <u>**Conclusion**</u>

Accordingly, it is **ORDERED** that the Defendant's summary judgment (Doc. 45) is **MOOT in part, GRANTED in part** and **DENIED in part** as follows: **MOOT** as to the claims and allegations set forth *supra* at note 15 as such have been **CONCEDED** or deemed **ABANDONED**; **DENIED** as to Count I (Title VII/Section 1981 ADA discrimination); **GRANTED** as to Count III (ADA unlawful disclosure of medical information 42 U.S.C. § 12112(d)); and **DENIED** as to Counts II and IV (ADA and Title VII/Section 1981 retaliation).

**DONE** and **ORDERED** this the **27th** day of **October 2022.**

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**